## STATE v. BOB BENSON.

(Filed 10 May, 1922.)

**1. ·Homicide—Murder—Evidence.**

Upon this trial for homicide the evidence of premeditation and delibera-
tion in the defendant's killing the deceased with a deadly weapon, *is held*
sufficient to sustain a verdict of murder in the first degree, and no error
is found in the trial in the court below.

**2. Same — Premeditation and Deliberation — Manslaughter—Justifiable
Homicide.**

The killing of a human being with malice,· and with premeditation and
deliberation, constitutes murder in the first degree, the element of pre-
meditation being the thought beforehand for some length of time, how-
ever short; and that of deliberation, the execution of the preconceived
intent, in cold blood, in furtherance of a fixed design to gratify a feeling
of revenge or to accomplish some unlawful purpose, and not under the
influence of a violent passion suddenly aroused by some lawful or just
cause or legal provocation.

**3. Same—Malice.**

Murder in the second degree is the unlawful killing of a human being
with malice, but without the elements of premeditation and deliberation;
and malice is that condition of mind which prompts a person to take the
life of another intentionally without just cause, excuse of justification, and
will be implied in law by the killing with a deadly weapon.

**4. Same—Burden of Proof—Satisfaction of Jury.**

The unlawful killing of a human being without either. malice, pre-
meditation or deliberation is manslaughter, and where the killing with a
deadly weapon is established, the burden is on the defendant to show to
the satisfaction of the jury, but neither by the preponderance of the
evidence, nor beyond a reasonable doubt, the lack of the elements of
malice, or the absence of all elements of crime necessary to establish his
justification in taking the life of the deceased.

**5. Homicide — Murder — Premeditation and Deliberation — Assault —
Threats—Abusive Language.**

Language however abusive will not alone reduce the offense of murder
to manslaughter, when such does not amount to an actual or threatened
assault, but where the deceased has unlawfully assaulted the prisoner
·against his will, who then killed him in the heat of passion caused by the
assault, the act of killing is homicide.

APPEAL by defendant from *McElroy, J.,,* at November Term, 1921, of
IREDELL.

Criminal prosecution, tried upon an indictment charging the defend-
ant with murder.

There was evidence on behalf of the State tending to show that
J. Robert Dishman, accompanied by Van Benfield, was traveling in a
Ford car along a public highway in Iredell County when, late in the

afternoon of Sunday, 18 September, 1921, he approached a horse and buggy standing near the edge of the road. The horse was tied to a post, with the buggy angling across the road. At the approach of the automobile the horse suddenly jerked back and that threw one of the buggy wheels out past the middle of the road. The car struck the buggy wheel and broke it as it pushed the buggy out of the way. This seems to have been the only damage done, except the breaking of some pieces of the harness.

Van Benfield testified: "I examined the buggy. Looked over the wheel, and saw it was broke, and I told Mr. Dishman I would crank the car. I started to crank the car to get back in the road to see how bad it was torn up. I started to crank the car and Bob Benson and Jule Cowan come out there. I started to give it a jerk and Benson said to me, 'Don't you crank that car.' I started again, and he run right up over me and said, 'Damn you, don't you crank that car.' Dishman said to me, 'Son, don't crank it,' and I never cranked it. Benson commenced cussing Dishman, told him, damn him, he had torn up his horse and buggy and had him to pay. And he would repeat it several times, and Mr. Dishman said, 'I will pay you. I have done it, and I will pay for it.' Benson said, 'You have tore up my horse and buggy,' and Dishman said to Benson, 'Get Dr. Cruse, and if the horse is hurt I will pay for it.' Dishman told Jule Cowan to go in the house and get the lantern and see how bad it was hurt, and how bad the horse was hurt, and Disman said if anything was hurt he would pay for it. Cowan went to the house to get the lantern. Benson commenced pulling off his coat, a white palm beach coat. He throwed it down in the buggy and he said, 'I will go get the officers, they will assess the damages.' Mr. Dishman said, 'Get the officers.' Said, 'I will pay whatever they assess it,' and he left to go to Mr. Privette's to phone for the officers.

"Benson left. Jule Cowan came back out with the lantern. When Benson left, Dishman said, 'Go get the officers. I will sit on the fender of the machine and wait till you get back.' He sat on the fender of the machine, and when Jule come out with the light he told Jule to sit by him, Benson was gone.' Benson was gone 30 minutes. When Benson came back Mr. Dishman was sitting on the fender of the machine and he said to him, 'Did you get the officers?' And his answer was, 'Damn you, you tore up my horse and buggy, and you have got me to pay.' Mr. Dishman said to him, 'Did you get the officers?' and he said, 'Damn you, you tore up my horse and buggy, and you have got me to pay.' Mr. Dishman said to him, 'Did you get the officers?' and he said, 'Damn you, you tore up my horse and buggy, and you have got me to pay.' Dishman asked him the third time if he got the officers, and he said, 'I ain't telling you, but what I didn't get the officers. Damn you, you tore

up my horse and buggy and you got me to pay.' Dishman said to him, 'I could have paid you long ago if you had told me how much it was.' Benson left the road and went in Jule's house. Dishman stayed there at the side of the car. I told Mr. Dishman to get in the car and let's go; there was no reasoning to it. Mr. Dishman got in the car. I just started to crank the car, had given it a half jerk, and there were two shot's fired out at Jule Cowan's house. I just raised up. Mr. Dishman said, 'Crank it, son, he is not going to shoot nobody,' and I just pulled the flood bar. The shots sounded like a 32 rifle, 32 pistol, or 38, wasn't no shot gun, no 22 rifle. I pulled the flood bar and started to crank the car by spinning it, turning it around and around. When the shots were fired, hadn't spun it none yet, but I went to spinning the car around and around and spun it until it catched and started, and when the car started, I raised up and Benson was a-pounding Dishman over the head, and as he was hitting him over the head he said, 'Damn you, I will kill you.' "

It appeared to the witness that the defendant was hitting Dishman with a gun.

The defendant himself told the officer, Fred Claywell, soon after he had been arrested, that he struck deceased with a pine pole, about three feet long. The following is the defendant's account of the killing, as related to the officer:

"He said he left his horse and buggy standing beside the road at Jule Cowan's. Said that Mr. Dishman and Mr. Benfield came along and they struck his buggy. Said that he went out and he asked Mr. Dishman what made him run into his buggy, and Mr. Dishman said, 'I didn't see your buggy until I was right against it.' Said, 'I didn't have time to stop.' He said, Mr. Dishman said, 'Your buggy was in the edge of the road, anyhow,' and Bob said he said to him, 'You have got me to pay, Mr. Dishman,' and he said he said, 'All right. I will pay you.' Says, 'I will pay you whatever the damages is.' And he told him, he said, 'You have got to pay me and pay me right now.' He said he said, 'All right, I will pay you whatever the damage is, or you can go get a new wheel and I will pay for it, just whichever you had rather,' and Bob said to him, said, 'Damn you, I will go get the officers,' and Mr. Dishman said, 'All right, go get the officers, and I will stay right here until they come, and I will pay the damages, whatever they say it is.' And he went to Mr. Privette's, and he could not get Statesville, the line was out of order, and he said that he went back and he said, 'I went back with the intention of knocking hell out of him or making him pay for my buggy.' And he said that when he got back to the car he told Mr. Dishman, 'Damn you, you are going to pay me and pay me right now,' and he said, 'Did you get the officers?' and he said that Mr. Dishman said, 'Well, I will pay

you whatever it is.' And he says, 'You are going to pay me or I am going to knock hell out of you.' Said he walked down to the lower side of the house and picked up a pine pole three or three and one-half feet long. He said he went back to the car and said, 'I just rapped him in the head.' He said, 'I hit him a hell of a lick the first time with both hands.' "

Dr. Davis testified that he examined the deceased at the hospital and his skull was mashed just like an egg shell.

The defendant introduced no evidence, but asked the court to instruct the jury to return a verdict of murder in the second degree. This instruction was declined, and is the basis upon which the defendant predicates his appeal.

The jury found the defendant guilty of murder in the first degree, and from the sentence of death pronounced thereon, this appeal is prosecuted.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*No counsel contra.*

STACY, J. The prisoner has had a fair trial. He has been convicted of murder in the first degree, and rightly so. His conduct was heartless and cruel. The deceased was unusually patient, and at no time was his manner threatening. On the contrary, again and again he reiterated that he was willing to pay the defendant for any damage he had sustained. There was abundant evidence to support the verdict.

His Honor charged the jury fully upon every aspect of the case, and explained clearly the difference between the three degrees of an unlawful homicide, to wit: murder in the first degree, murder in the second degree and manslaughter.

Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. *S. v. Thomas,* 118 N. C., 1118.

Premeditation means "thought of beforehand" for some length of time, however short. *S. v. McClure,* 166 N. C., 328.

Deliberation means that the act is done in a cool state of the blood. It does not mean brooding over it or reflecting upon it for a week, a day, or an hour, or any other appreciable length of time, but it means an intention to kill, executed by the defendant in a cool state of the blood, in furtherance of a fixed design to gratify a feeling of revenge, or to accomplish some unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation. *S. v. Coffey,* 174 N. C., 814. When we say the killing must be accompanied by premeditation and deliberation, it is meant that there must be a fixed purpose to kill, which precedes the act of killing,

for some time, however short, although the manner and length of time in which the purpose is formed is not very material. *S. v. Walker,* 173 N. C., 780.

Murder in the second degree is the unlawful killing of a human being with malice, but without premeditation and deliberation. *S. v. Lipscomb,* 134 N. C., 695; *S. v. Fuller,* 114 N. C., 885.

Malice is not only hatred, ill-will, or spite, as it is ordinarily understood—to be sure that is malice—but it also means that condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification. *S. v. Banks,* 143 N. C., 652. It may be shown by evidence of hatred, ill-will, or dislike, and it is implied in law from the killing with a deadly weapon; and a pistol or a gun is a deadly weapon. *S. v. Lane,* 166 N. C., 333.

Manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation. *S. v. Baldwin,* 152 N. C., 822.

Manslaughter plus malice gives us murder in the second degree; and murder in the second degree plus premeditation and deliberation gives us murder in the first degree. *S. v. Banks,* 143 N. C., 652.

When it is admitted or proven that the defendant killed the deceased with a deadly weapon, the law raises two presumptions against him: first, that the killing was unlawful; and second, that it was done with malice; and an unlawful killing with malice is murder in the second degree. *S. v. Fowler,* 151 N. C., 732.

The law then casts upon the defendant the burden of proving to the satisfaction of the jury—not by the greater weight of the evidence nor beyond a reasonable doubt—but simply to the satisfaction of the jury (*S. v. Carland,* 90 N. C., 675), the legal provocation that will rob the crime of malice and thus reduce it to manslaughter, or that will excuse it altogether upon the grounds of self-defense, accident, or misadventure. *S. v. Little,* 178 N. C., 722.

The legal provocation which will reduce murder in the second degree to manslaughter must be more than words; as language, however abusive, neither excuses nor mitigates the killing, and the law does not recognize circumstances as a legal provocation which in themselves do not amount to an actual or threatened assault. 13 R. C. L., 795. If, however, the deceased assaulted the prisoner; that is, if he laid his hands upon him against his will, or struck him, or choked him, and the prisoner killed the deceased in the heat of passion, caused by the assault, and not from premeditation and deliberation, and not from malice, he would not be guilty of more than the crime of manslaughter.

There is no error appearing on the instant record, and the judgment must be affirmed.

No error.