STATE OF NORTH CAROLINA  v. BILLY D. McQUEEN, JR.

No. 32A86

(Filed 2 March 1989)

### 1. Homicide § 25.2— murder—instructions on premeditation and deliberation—absence of any excuse or justification

There was no plain error in a prosecution for first degree murder from the court's use of "the absence of any excuse or justification" as a factor in determining premeditation and deliberation because there was no evidence introduced at trial to show that any just cause, excuse or justification for the murder existed.

### 2. Criminal Law § 75.2— incriminating statements made after arrest—admissibility

The trial court in a prosecution for first degree murder correctly ruled on the admissibility of a group of statements made during and after defendant's arrest where questions from a trooper about the whereabouts of guns were clearly designed to elicit an incriminating response and were properly ruled inadmissible; questions from a trooper asking defendant whether he was tired and hungry and whether he had come all the way down the river were in the nature of general conversation which took place during rest periods in the climb out of the river gorge and it cannot be said that the trooper should have known that such generalized questions were reasonably likely to elicit an incriminating response from defendant; and those questions were not designed to elicit questions defendant himself subsequently put to officers.

### 3. Criminal Law § 75.4— murder—statements made after Miranda warnings and request for attorney—admissible

The trial court did not err in a first degree murder prosecution by admitting statements defendant made to S.B.I. agents after defendant had received *Miranda* warnings twice and had requested an attorney where defendant received *Miranda* warnings when he was arrested by state troopers, defendant again received *Miranda* warnings when interrogated by S.B.I. agents because they had no knowledge that defendant had already been read his rights, defendant underscored the line on the warnings form which stated "I do not want a lawyer at this time" and signed the form, defendant gave several equivocal answers and the agents attempted to obtain a statement from defendant until he stated for the first time unequivocally "I want my lawyer," the agents terminated the interview and one agent left the room to get the arrest warrant, the remaining agent was silent, defendant began to cry and made certain statements and asked certain questions, and neither agent asked defendant any questions from the time he stated "I want my lawyer." The totality of the circumstances demonstrates a valid waiver of defendant's *Miranda* rights, and the silence of the agent who remained in the interrogation room, his willingness to respond to defendant's questions, and his actual answers cannot be equated with words or actions that he should have known were reasonably likely to elicit an incriminating response.

#### 4. Criminal Law § 75.4— invocation of right to counsel—statement admissible

The trial court did not err in a first degree murder prosecution by permitting the State to cross-examine defendant about a statement made to an S.B.I. agent regarding the location of guns used in the murder where the State had introduced evidence that defendant left a car with a rifle, a pistol and a box of ammunition and had only two pocketknives in his possession when he was arrested; defendant's counsel repeatedly pointed out on cross-examination of the arresting officers that the guns had not been found; defendant testified that he had only a knife when he left the car; on cross-examination by the State, defendant testified that in response to a question from agents about the location of the guns he stated that he would talk to them if his attorneys said it was all right; and an S.B.I. agent testified in rebuttal that defendant had said that he would tell them where the guns were if his lawyer told him to. Defendant took the stand at trial and opened the door to the cross-examination; prior statements mentioning a lawyer do not give a defendant a license to commit perjury on the stand. Furthermore, defendant's knowledge of the location of the guns was not a collateral matter because his version of the events was that he was suffering an alcoholic blackout or that his companion had committed the crime and the State's theory was that defendant had control of the weapons at all times and that he left the car with them.

#### 5. Criminal Law § 73— murder—statement of companion—hearsay

There was no prejudicial error in a first degree murder prosecution for the killing of a state trooper where the trial court sustained the State's objection to testimony that, when defendant and a companion woke up in the companion's car, the companion asked defendant "You don't remember killing a state trooper?" Defendant's testimony was hearsay and falls within none of the exceptions to the hearsay rule; defendant had previously cross-examined the companion as to whether he had asked defendant this question and the companion had denied doing so; and similar evidence was before the jury.

#### 6. Criminal Law § 83.1— murder—testimony against defendant by wife—no error

The trial court did not err in a first degree murder prosecution for the murder of a state trooper by admitting testimony from defendant's wife that defendant was on his way to North Carolina to kill his wife. The testimony of defendant's wife on voir dire demonstrates that she was aware of her right to refuse to testify but that she voluntarily chose to do so; moreover, defendant's threat to come to North Carolina and cut her into "little, bitty pieces" was not a confidential marital communication because threats are not confidential communications.

#### 7. Criminal Law § 86.2— murder—prior incident—admissible

The testimony of defendant's wife in a first degree murder prosecution of a state trooper concerning a prior incident in which defendant had used a gun and made threats against her was relevant because it tended to illustrate defendant's intent to get to his wife at anyone's expense. It was therefore properly admitted where the trial court denied the State's motion for permission to question the wife about the prior incident, defendant took the stand and admitted on cross-examination to the prior altercation and convictions without objection, defendant then recalled his wife during his case in chief, and the wife

testified to the prior incident during cross-examination by the State. N.C.G.S. § 8C-1, Rule 404(b).

**8. Criminal Law § 33.3 — murder — corroboration testimony — not a collateral matter**

Testimony in a prosecution for the murder of a highway patrolman did not address a collateral matter and was properly admitted where defendant's wife's friend and employer were both called to corroborate the wife's testimony that defendant had threatened to kill her on the day before he left Kentucky. This testimony went to the core of the State's theory that defendant intended to travel from Kentucky to North Carolina to do harm to his wife or at least to get her back, and that he intended to remove anyone who stood in his way. N.C.G.S. § 8C-1, Rule 402.

**9. Homicide § 8.1 — murder — intoxication — no prejudicial error in instruction**

There was no prejudicial error in the trial court's instruction on voluntary intoxication in a prosecution for the murder of a state trooper where the court erroneously charged the jury that defendant would not be guilty of murder in the first degree if, as a result of intoxication, he was utterly incapable of forming the specific intent to kill. The evidence might support an inference that defendant was intoxicated, but it would not support a conclusion that defendant was intoxicated to the extent that he was utterly incapable of forming the specific intent to kill after premeditation and deliberation, and defendant was not entitled to any jury instruction on the issue of voluntary intoxication.

Chief Justice EXUM dissenting.

APPEAL as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from the imposition of a life sentence entered by *Friday, J.*, at the 23 September 1985 Session of Superior Court, HAYWOOD County, upon defendant's conviction by a jury of one count of first-degree murder. Heard in the Supreme Court 14 November 1988.

*Lacy H. Thornburg, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General, and Linda Anne Morris, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Mark D. Montgomery, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

Defendant was indicted on one count of first-degree murder for the shooting death of Trooper Giles Harmon of the North Car-

olina Highway Patrol. The case was tried capitally, on a theory of premeditated and deliberated murder.

The State's evidence tended to show the following events. In November 1984 defendant and his wife, Marsha McQueen, separated for the second time. Marsha McQueen moved from their home in Lexington, Kentucky, to Statesville, North Carolina. Defendant remained in Kentucky and began living with Charles "Ickey" Barker, a man he had known for several years, who owned a farm near Lexington.

On 7 April 1985, Marsha McQueen was with her friend Ann Sims. Defendant telephoned, asking to speak to his wife. He then informed his wife that he was going to come to North Carolina and cut her into "little, bitty pieces." On 8 April 1985, defendant telephoned Ann Sims several times and told her to put Marsha McQueen on a bus and send her home to Kentucky. He stated that he was going to kill Ann Sims and her husband and blow up their home. Defendant told Ann Sims that he had a stick of dynamite and a .22 rifle with a scope and that no one would see him. When Ann Sims expostulated, "no woman is worth this," defendant replied, "Well, I'm going to kill you all. You're not going to see me," and said that no one was going to stand in his way. Also on 8 April defendant telephoned Carl Fox, the manager at the store where Marsha McQueen worked, and told him to fire her because he would make so much trouble that it would not be worthwhile retaining her as an employee.

State's witness Charles "Ickey" Barker testified that during the course of 8 April 1985, he and defendant drank a fifth of liquor and one-half of a case of beer and watched a movie on television in the evening. Barker went to bed at approximately 2:00 a.m. At approximately 4:30 a.m. on 9 April 1985, defendant, who had Barker's .22 rifle, woke Barker and demanded that Barker drive him to North Carolina. Since he needed money for the trip, defendant also demanded that Barker use his bank card to withdraw $500.00 from his account. Barker refused and after an argument during which defendant several times threatened to shoot Barker, the latter ran into the kitchen and returned with a knife. Barker testified that his intent was to get the rifle away from defendant, but he saw that defendant was going to shoot him. He turned to reenter the kitchen, and as he did so, defendant shot

him in the right thigh. Defendant bandaged Barker's leg with a shirt sleeve to stop the bleeding. He then took Barker's .22 pistol, as well as the rifle, made him dress and forced him to write a note to his farmhand that he was taking defendant to Knoxville, Tennessee.

Barker testified that as the two left his house by the kitchen door, defendant shot Barker's dog in the paw. Defendant and Barker took the latter's car. Defendant had the rifle, the pistol and several boxes of ammunition under his control inside the car. Defendant drove to a local store where there was a bank teller machine and forced Barker at gunpoint to withdraw $60.00 from his account and give it to him. Defendant attempted to get more money from the machine but was unsuccessful.

With defendant driving, the men proceeded south on Interstate 75. In the afternoon of 9 April, they stopped in Newport, Tennessee. Defendant bought some food and a six-pack or two and two quarts of beer. They went to a motel, where defendant made Barker hide in the car while he registered using Barker's driver's license. Once in the motel room, defendant pushed one of the beds against the door to prevent Barker from escaping. Both men slept for some time. Barker testified that defendant wanted him to write a check for $5,000. Barker told defendant that he was going to use the bathroom. He tore the checkbook in half and hid the pieces there. Defendant had gone back to sleep, but when Barker attempted to leave the motel room, defendant woke up and threatened to shoot him.

Soon after dark, defendant and Barker left the motel, and with defendant behind the wheel, they drove east on Interstate 40. Defendant was driving Barker's car at a high rate of speed. Barker tried to persuade defendant to slow down, but defendant stated that if an officer stopped him, he would have to kill the officer. As the Interstate entered North Carolina from Tennessee, it narrowed from two lanes to one. A large cave-in had closed one of the road tunnels in the area, so that traffic was detoured. Because of the detour, two Troopers of the North Carolina Highway Patrol were assigned to the area twenty-four hours a day. One of the Troopers assigned on 9 April 1985 was the victim, Giles Harmon.

Defendant was still driving very fast. Shortly after 9:00 p.m., having traveled approximately three miles into North Carolina on Interstate 40, the men saw the blue light of a State Highway Patrol vehicle begin to flash behind Barker's car. Defendant commented that "they" were not going to take him to jail. He pulled over to the side of the road and stopped. Trooper Harmon left his vehicle and approached Barker's car. As he came to the driver's door, defendant stuck the pistol out of the window, held the barrel against Trooper Harmon's chest and pulled the trigger. Trooper Harmon turned around and began to stagger away. Defendant cocked the pistol and fired again. This bullet entered Trooper Harmon's back, severing his spine.

Defendant started Barker's car and drove off as fast as the car would go, passing several trucks on the right. Barker heard him say, "I killed a man." Defendant took the first exit off Interstate 40, turned onto a logging road and drove for approximately six miles. The men then saw a bridle trail which was barred to vehicles by three posts. Defendant used the car's front bumper to loosen the middle post. He pulled it up, drove the car onto the trail and then replaced the post. Having continued up the trail for some way, defendant tied Barker up with some sheets stolen from the Newport motel. The two spent the night in the car.

Barker testified that he and defendant awoke at approximately 6:30 a.m. the next morning, 10 April 1985. Defendant untied Barker's bonds. He told Barker that he believed he had killed a man. They listened to the car radio and heard that Trooper Harmon was dead. The men heard helicopters passing overhead, so defendant camouflaged the car. At approximately 12:30 p.m., defendant took the two guns and a box of ammunition and left on foot. Barker waited for about an hour and then drove his car out.

Barker was interviewed at the law enforcement command post and then taken to the hospital. As a result of his information, officers located the bridle trail and the site where the car had been hidden overnight. The ongoing manhunt for defendant intensified. On 11 April 1985, a motorist reported sighting defendant. Law enforcement officers apprehended defendant in a dry riverbed, approximately 250 to 300 yards below and away from the In-

terstate. Defendant was handcuffed and brought up the steep cliff to the road.

At trial, defendant took the stand on his own behalf. He testified that he had been in several alcohol and drug detoxification centers in the past. Defendant testified that he and Barker were both drinking heavily during the afternoon and evening of 8 April 1985, and at some point, defendant passed out. He was later awakened by Barker, an admitted homosexual, who had pulled down defendant's pants. A struggle ensued, during which defendant shot Barker in the leg. According to defendant, Barker shot the dog because it stole a sandwich off a plate. Defendant testified that Barker agreed to take him to North Carolina. He testified that he did not remember who was driving, but that he had vague memories of traveling through Tennessee and into North Carolina. He did not want Barker's money, so he tore up Barker's checkbook himself. He had a clear memory of waking in the car on the morning of 10 April. Defendant further testified that after he heard on the radio that a Trooper had been killed, after Barker suggested to him that defendant had shot the Trooper and after he saw police helicopters flying overhead, he became scared and decided to run. Before he could decide whether to turn himself in, he was found by law enforcement officers and arrested.

Defendant presented expert testimony that he was an alcoholic, that he had "very possibl[y]" been experiencing an "alcoholic blackout" during the time of the shooting and that, in any event, he did not have the ability to form the specific intent to kill at the time.

The jury found defendant guilty of first-degree murder. At the sentencing hearing, several aggravating and mitigating circumstances were submitted to the jury. The jury found in aggravation that the murder was committed for the purpose of preventing a lawful arrest and that the murder was against a State Highway Patrolman while engaged in the performance of his official duties, but did not find that the murder was committed while defendant was engaged in the commission of or attempt to commit the felony of kidnapping. In mitigation, the jury found that the murder was committed while defendant was under the influence of mental or emotional disturbance and that defendant was a battered and abused child, but did not answer whether de-

fendant had no significant history of prior criminal activity or whether there were any other circumstances arising from the evidence which it deemed to have mitigating value. The jury recommended a sentence of life imprisonment, which the trial court imposed.

Defendant presents six issues for our consideration, all of which pertain to the guilt-innocence phase of his trial. We find no prejudicial error.

[1] Defendant first assigns error to the trial court's instructions to the jury on premeditation and deliberation. The court instructed in part as follows:

Now, members of the jury, neither premeditation or deliberation are ususally [sic] susceptible of direct proof. They may be proven from circumstances from which they may be inferred, such as the lack of provocation on the part of the victim, the conduct of the defendant before, during and after the killing, any threats or declarations of the defendant at the time, *the absence of any excuse or justification for the shooting*, the number of shots fired and where fired, the declarations of the defendant prior to the shooting and the manner in which the killing was done.

(Emphasis added.) Defendant argues that this instruction allowed the jury to find the premeditation and deliberation required for a verdict of first-degree murder on an improper basis, because a killing without "just cause, excuse or justification" is the basis for a verdict of second-degree murder, not first-degree murder. *State v. Benson*, 183 N.C. 795, 799, 111 S.E. 869, 871 (1922).

Defendant concedes that he failed to object to this instruction at trial. Any alleged error must therefore be scrutinized under the "plain error" standard promulgated in *State v. Odom*, 307 N.C. 655, 300 S.E. 2d 375 (1983). The plain error standard is intended for those rare cases where an instructional error causes a miscarriage of justice. *State v. Dixon*, 321 N.C. 111, 361 S.E. 2d 562 (1987). Before deciding that an error by the trial court amounts to "plain error," an appellate court must be convinced that absent the error, the jury would probably have reached a different result. *State v. Walker*, 316 N.C. 33, 340 S.E. 2d 80 (1986). Defendant carries a heavier burden of persuasion under this

standard than he would under N.C.G.S. § 15A-1443. *See State v. Gardner*, 315 N.C. 444, 340 S.E. 2d 701 (1986).

First-degree murder based upon a theory of premeditation and deliberation requires a showing of the intentional killing of a human being with malice and after premeditation and deliberation. N.C.G.S. § 14-17 (1986); *State v. Melton*, 307 N.C. 370, 298 S.E. 2d 675 (1983). We have consistently defined premeditation and deliberation as follows:

> Premeditation means "thought of beforehand" for some length of time, however short. *S. v. McClure*, 166 N.C. 328[, 81 S.E. 458 (1914)].

> Deliberation means the act is done in a cool state of the blood. It does not mean brooding over it or reflecting upon it for a week, a day, or an hour, or any other appreciable length of time, but it means an intention to kill, executed by the defendant in a cool state of the blood, in furtherance of a fixed design to gratify a feeling of revenge, or to accomplish some unlawful purpose, and *not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation. S. v. Coffey*, 174 N.C. 814[, 94 S.E. 416 (1917)].

*State v. Benson*, 183 N.C. 795, 798, 111 S.E. 869, 871 (1922) (emphasis added). *See also State v. Rose*, 323 N.C. 455, 460, 373 S.E. 2d 426, 429 (1988); *State v. Biggs*, 292 N.C. 328, 337, 233 S.E. 2d 512, 517 (1977).

The State contends that the trial judge was following the applicable law in his instructions regarding premeditation and deliberation, because listing an "absence of any excuse or justification" for the shooting as a factor for the jury's consideration in determining whether defendant was guilty of first-degree murder was the equivalent of listing the factor as a lack of a "lawful or just cause or legal provocation." *State v. Benson*, 183 N.C. 795, 111 S.E. 869. However, even assuming, arguendo, that the "absence of any excuse or justification" language used by the trial court was error, it does not rise to the level of "plain error" under *State v. Walker*, 316 N.C. 33, 340 S.E. 2d 80. The transcript reveals that no evidence was introduced at trial to show that any just cause, excuse or justification for the murder existed. Therefore, we are

convinced that, absent the challenged language in the instruction, the jury would not have reached a different result. *Id.* This assignment of error is overruled.

Defendant next assigns error to the trial court's denial of his motion to suppress certain statements that defendant made during and after his arrest. Since the statements are separated in time and circumstances, we address them separately.

[2] The transcript reveals that the first group of statements occurred after law enforcement officers had found defendant in the dry riverbed below Interstate 40. Defendant was lying face down among the rocks. Trooper Campbell placed his revolver on the back of defendant's head and told him not to move. While Officer Warren handcuffed defendant, Sergeant Buchanan of the Highway Patrol asked defendant several times where his guns were located. Each time, defendant replied, "No comment." Trooper Thompson arrived as defendant was placed on his feet. As the officers were discussing the easiest route of egress from the river gorge, Trooper Thompson discovered that defendant had not been advised of his constitutional rights (in accordance with *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694 (1966)) and proceeded to administer them to defendant. Trooper Thompson then asked defendant if he wished to say anything, to which defendant replied, "Not without a lawyer."

As the officers were taking defendant out of the gorge, Trooper Thompson said to him, "I guess you're tired and hungry." Defendant replied, "Yes, sir, I'm wore out." Trooper Thompson asked defendant if he had come all the way down the river, to which defendant responded, "That's the only way I could get around you guys." Approximately five minutes later, defendant addressed Trooper Thompson with, "You've asked me several questions. Now can I ask you one?" Trooper Thompson replied, "Sure." Defendant then asked, "[W]hat is all this about?" One of the officers said, "No comment." Defendant asked, "Does this involve murder?" and "Did the man have any children?" Trooper Thompson responded, "What difference does that make?" One of the officers said, "He had a wife." No further conversation occurred until defendant was brought up to the highway and placed in a patrol car with an agent from the State Bureau of Investigation.

Defendant now argues that although he invoked his right to counsel as soon as he was advised of his *Miranda* rights, he was nevertheless interrogated on the way out of the gorge. According to defendant, the officers' questions to him were successfully calculated to elicit responses from him. Defendant maintains that he did not waive the right to counsel merely by "agreeing to respond to the . . . continued interrogation." As a result, he made several statements that he asserts the jury might have understood as indicating guilty knowledge on his part. He contends that all the statements he made subsequent to invoking his right to counsel in the river gorge should have been found inadmissible by the trial court. In addition, he complains that the trial court made inadequate findings of fact when it ruled that all defendant's questions to law enforcement officers and all his responses to their questions immediately after his arrest, except those concerning the whereabouts of the guns, were admissible.

We note that when defendant filed his motion to suppress these statements, he failed to file a supporting affidavit as required by N.C.G.S. § 15A-977(a). This omission would ordinarily amount to a waiver on appeal of the right to contest the admission of evidence on either statutory or constitutional grounds. *State v. Holloway*, 311 N.C. 573, 578, 319 S.E. 2d 261, 264 (1984). Notwithstanding defendant's omission, however, we elect to address the issue under our supervisory powers. N.C.R. App. P. 2.

The facts here are not in dispute. We are satisfied that the trial court's findings of fact as to the statements defendant made in the river gorge are adequate, though they do not directly address the voluntariness of these particular exchanges. It is not error per se for the trial court to omit findings of fact. *State v. Phillips*, 300 N.C. 678, 268 S.E. 2d 452 (1980).

The ultimate test of the admissibility of a statement is whether it was voluntarily and understandingly made. *State v. Davis*, 305 N.C. 400, 290 S.E. 2d 574 (1982). A volunteered statement of any kind is not barred by the fifth amendment. *Miranda v. Arizona*, 384 U.S. 436, 478, 16 L.Ed. 2d 694, 726. *Accord, State v. Tann*, 302 N.C. 89, 273 S.E. 2d 720 (1981). Voluntariness is judged by the totality of the circumstances. *State v. Pruitt*, 286 N.C. 442, 212 S.E. 2d 92 (1975). If the *Miranda* safeguards are to

be implicated, questioning of the defendant or its functional equivalent must occur. Such interrogation is defined as follows:

> A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect . . . amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Rhode Island v. Innis*, 446 U.S. 291, 301-02, 64 L.Ed. 2d 297, 308 (1980). The interrogation must reflect a measure of compulsion above and beyond that inherent in custody itself. *State v. Ladd*, 308 N.C. 272, 302 S.E. 2d 164 (1983).

Applying these principles to the questions and statements in the river gorge, we conclude that the trial court ruled correctly on their admissibility. Sergeant Buchanan's questions to defendant as to the whereabouts of the guns were clearly designed to elicit an incriminating response and were properly ruled inadmissible. In contrast, however, Trooper Thompson's questions to defendant asking whether he was tired and hungry and whether he had come all the way down the river were in the nature of general conversation which took place during rest periods in the climb out of the gorge. We cannot say that Trooper Thompson should have known that such generalized questions were reasonably likely to elicit an incriminating response from defendant. *See State v. Young*, 317 N.C. 396, 346 S.E. 2d 626 (1986) (officer's statement to defendant during booking that he thought defendant was lying was not interrogation); *State v. Forney*, 310 N.C. 126, 310 S.E. 2d 20 (1984) (sheriff's question to defendant as to whether he knew other persons involved was not interrogation). Moreover, these questions were not designed to elicit the questions defendant himself subsequently put to the officers. Defendant said, "You've asked me several questions. Now can I ask you one?" He then asked why he had been arrested, whether his arrest involved murder, and several questions about the victim. For the most part, he received noncommittal answers. Under the totality of the circumstances, we conclude that defendant's responses to Trooper Thompson's generalized questions and his own questions to the of-

ficers taking him out of the river gorge were voluntary, *Edwards v. Arizona*, 451 U.S. 477, 68 L.Ed. 2d 378 (1981); *see State v. Banks*, 322 N.C. 753, 370 S.E. 2d 398 (1988); *State v. Herring*, 322 N.C. 733, 370 S.E. 2d 363 (1988), and were not the result of an interrogation, *Rhode Island v. Innis*, 446 U.S. 291, 64 L.Ed. 2d 297.

[3] After climbing out of the gorge onto the highway, SBI Agent Jones took defendant to the Highway Patrol station, so that he and Agent Rasmussen could interview him. Agent Rasmussen testified that because the agents had no knowledge that defendant had already been read his *Miranda* rights, Agent Jones proceeded to read them to defendant again. He read the rights aloud from a written waiver of rights form while defendant took a pen and followed the words across the paper as if he were reading them. Defendant underscored the line which stated, "I do not want a lawyer at this time," and signed the form. The interview began with standard questions about defendant's height and weight. When Agent Rasmussen asked defendant for his address, defendant replied, "I don't know whether I should answer any more questions." The interview continued. The agents told defendant that they knew what had happened and wanted his side of the story. In response, defendant asked whether the agents could obtain food and clean clothes for him when he was taken to the jail. Agent Rasmussen replied that he would attempt to get defendant a jail uniform when they went to the jail. The agents provided defendant with water and cigarettes upon his request and attempted to continue the interview by challenging defendant with the information they had about the murder, with a view "to encourage him to . . . to confess to the crime." Defendant gave several equivocal responses, such as, "I might should wait to tomorrow morning to answer that," "I might tell you tomorrow morning after I talk to my lawyer," and "Maybe I should talk to my lawyer before I answer that." The agents attempted to obtain a statement from defendant until he stated for the first time unequivocally, "I want my lawyer," whereupon they terminated the interview and Agent Jones left the room to get the arrest warrant.

After Agent Jones had left, Agent Rasmussen was silent. Defendant began to cry. He sobbed, "What a waste. . . . What a waste." After a pause, during which he was crying softly, he said, "I'm no better off than he is." Then he said, "Oh yes I am. At

least I'm alive. I can see my mother and sister." Defendant then asked whether the agents had spoken to his wife. He inquired of Agent Rasmussen about the several degrees of murder, the sentences they carry and whether any executions had occurred in North Carolina. He asked whether Barker was going to bring kidnapping charges against him and how Barker's car had been found. Agent Rasmussen attempted to answer all of defendant's questions. Agent Jones then returned with the arrest warrant. From the time defendant stated, "I want my lawyer," to his incarceration, neither Agent Jones nor Agent Rasmussen asked defendant any questions. The trial court ruled that the statements defendant made and the questions he asked of Agent Rasmussen after Agent Jones left the room were all volunteered and therefore admissible at trial. Defendant argues, however, that the trial court erred in doing so because the statements he made at the Highway Patrol station were the result of police interrogation after he had again invoked his right to counsel.

The trial judge found as a fact that although defendant was in custody, his questions and statements were voluntarily made. Defendant received cigarettes and water upon request. His handcuffs had been removed. The agents were not armed. Agent Rasmussen testified that, in his observation, although defendant was disheveled, he was coherent and appeared to be sober. Defendant followed the wording of the waiver form and underlined the statement waiving the presence of a lawyer. He then signed the form. We conclude that the totality of the circumstances demonstrate a valid waiver of defendant's *Miranda* rights. Defendant further contends, however, that this second *Miranda* warning was a violation of *Edwards v. Arizona*, 451 U.S. 477, 68 L.Ed. 2d 378. He relied on the United States Supreme Court's recent opinion in *Arizona v. Roberson*, --- U.S. ---, 100 L.Ed. 2d 704 (1988), wherein the Court held (1) that the *Edwards* rule that a suspect who has invoked his right to counsel is not subject to further interrogation until counsel has been made available to him applies when a police-initiated interrogation following a suspect's request for counsel occurs in the context of a separate investigation, and (2) that the fact that the officer who conducted the defendant's second interrogation did not know he had requested counsel when he was arrested could not justify his failure to honor that request. Defendant's reliance upon *Roberson* is misplaced because (1) here

there was only one investigation and (2) the SBI agents honored defendant's request for a lawyer once he had claimed the privilege in plain terms.

The agents terminated the interview with defendant when he unequivocally stated, "I want my lawyer." With regard to defendant's statements and questions made after this juncture, the same principles discussed above apply here. The transcript fails to show that defendant was thereafter "interrogated" as the term is defined in *Rhode Island v. Innis*, 446 U.S. 291, 301-02, 64 L.Ed. 2d 297, 308. After Agent Jones left to get the arrest warrant, defendant began to cry and initiated the break in the silence by directing a series of questions to Agent Rasmussen. Agent Rasmussen remained silent from the time of Agent Jones' departure from the interview room until he answered defendant's direct questions. The transcript demonstrates that Agent Rasmussen's answers were factual but terse. We cannot equate Agent Rasmussen's silence, his willingness to respond to defendant's questions or his actual answers to them with "words or actions . . . that [he] *should have known* were reasonably likely to elicit an incriminating response." *Id.* Defendant's statements and questions were voluntary. *Edwards v. Arizona*, 451 U.S. 477, 68 L.Ed. 2d 378; *State v. Herring*, 322 N.C. 733, 370 S.E. 2d 363. The trial court did not err in admitting them. This assignment of error is overruled.

[4] Defendant next contends that the trial court erred in permitting the State to cross-examine defendant about a statement that he made to Agent Jones at the Highway Patrol station regarding the location of the guns. He argues that the statement was an invocation of his right to counsel and was therefore inadmissible. The State introduced evidence through Charles Barker that defendant left Barker's car with a rifle, a pistol and a box of ammunition. When defendant was arrested, he had only two pocketknives in his possession. On cross-examination of the arresting officers, defendant's counsel repeatedly pointed out that the guns had not been found. When defendant took the stand, he testified that he had only a knife when he left Barker's car. On cross-examination of defendant by the State, the following colloquy occurred:

State v. McQueen

Q. Do you remember [Agent Jones] asking you after you were arrested, "Billy, at least tell us where the guns are."? Do you remember him asking you that question?

A. Yes, sir, he asked me where the guns were, to tell them where the rifle and pistol were, and I told them I would tell them anything they asked, that they wanted to know, the next day after I talked to my attorney and found out what was going on, what was being said.

Q. I'll ask you if your words weren't, "After I talk to my lawyer and if he tells me, I'll tell you."? Isn't that what you said?

A. Probably. If . . . not to that . . . not exactly like that, no, sir.

Q. Well, how exactly was it?

A. We was up in the jail. It was after I had been arrested and brought . . . after they had questioned me, and I kept asking them to help me . . . I kept asking them if I could get some food and some clothes, and the last thing they asked me before I went—before they started taking me up, was, "Billy, at least tell us where the guns are." I believe that was the question, something like that. And I said to him, "I'll tell you . . . ." I can't think for sure exactly what the words was, but I told them I would tell them anything they wanted to know.

Q. After you talked to your lawyers and if they told you to.

MR. JORDAN: Objection.

THE COURT: Overruled.

A. Yes, sir, that's right.

Q. After they told you to.

A. No, sir, not if they told me to. If I did say that what I was saying, what I meant is I would talk to them if my attorneys[] said it was all right to talk to them[.]

Q. Do you know where those guns are today?

A. No, sir, I haven't the vaguest idea.

The State called Agent Jones as a rebuttal witness. He testified as follows:

A. I walked over to Mr. McQueen, put my hand on his shoulder and said, "Billy, at least tell us where the guns are at."

MR. BROWN: Objection.

THE COURT: Overruled.

THE WITNESS: He said, "After I talk to my lawyer and if he tells me to, I'll tell you where they are at."

Defendant argues that by giving him the *Miranda* warnings at the Highway Patrol station, the SBI agents indicated that they were prepared to recognize his right to the presence of an attorney should he choose to exercise it. Relying inter alia on *State v. Ladd*, 308 N.C. 272, 302 S.E. 2d 164, defendant contends that the statement, "After I talk to my lawyer and if he tells me to, I'll tell you where they are at," was an invocation of his constitutional privilege to counsel and should not have been admitted into evidence against him. We disagree.

Defendant correctly asserts that in several cases where the defendants did not take the stand at trial, we held that the introduction of testimony relating to their constitutional rights under *Miranda* was impermissible. *See, e.g., State v. Ladd*, 308 N.C. 272 (State may not introduce evidence relating to defendant's expression of his right to counsel during custodial interrogation); *State v. McCall*, 286 N.C. 472, 212 S.E. 2d 132 (1975), *judgment vacated in part*, 429 U.S. 912, 50 L.Ed. 2d 278 (1976) (State may not introduce evidence that defendant exercised his fifth amendment right to remain silent); *State v. Castor*, 285 N.C. 286, 204 S.E. 2d 848 (1974) (same). These decisions have no application to this case, however, because here defendant took the stand at trial and opened the door to the State's cross-examination. *See Harris v. New York*, 401 U.S. 222, 28 L.Ed. 2d 1 (1971). In *Harris*, the issue was whether otherwise inadmissible statements under *Miranda* could be used to impeach a defendant's credibility. The United States Supreme Court stated:

Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot

be construed to include the right to commit perjury. Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment.

*Id.* at 225-26, 28 L.Ed. 2d at 4-5 (citations omitted). The same interests apply here. Defendant had testified on direct examination that he had two knives but no "weapons" when he left Barker's car. On cross-examination, the State attempted to bring out the fact that, while at the Highway Patrol station, defendant had told the SBI agents that he knew where the guns were. Prior statements mentioning a lawyer do not give a defendant license to commit perjury on the stand. The State was properly using "traditional truth-testing devices" to impeach defendant's credibility by questioning him about a prior inconsistent statement.

Defendant argues further that the issue of his knowledge of the location of the guns was a collateral matter with regard to the question of whether he intentionally shot Trooper Harmon, so that he was not subject to impeachment by extrinsic evidence. We disagree. Defendant's version of the events was that he was suffering an alcoholic blackout or that Charles Barker had committed the crime. The State's theory was that defendant had control of the weapons at all times and that he left Barker's car with them. Even after an extensive search, the guns were never found. Defendant's statement to Agent Jones at the Highway Patrol station that he would reveal the location of the guns was in direct conflict with defendant's own testimony that he had left Barker's car without them and had no idea where they were. We conclude that defendant's knowledge of the location of the murder weapon was not a collateral matter. *See State v. Williams*, 322 N.C. 452, 368 S.E. 2d 624 (1988). This assignment of error is overruled.

[5] Defendant next assigns error to the trial court's exclusion of a statement that Charles Barker allegedly made to defendant on the morning after the killing. Defendant wished to testify that, when the two men woke up in Barker's car, Barker asked defend-

ant, "You don't remember killing a State Trooper?" The trial court sustained the State's objection to this testimony. Defendant contends that Barker's question was admissible as relevant testimony under N.C.G.S. § 8C-1, Rule 401, because it tended to prove that defendant did not remember the shooting. He argues that the testimony was also admissible to impeach Barker's testimony that he had not asked defendant this question. These contentions are without merit. Defendant's testimony is hearsay. *See* N.C.G.S. § 8C-1, Rules 801(c), 802 (1988). It falls within none of the exceptions to the rule prohibiting hearsay. *See* N.C.G.S. § 8C-1, Rules 803, 804 (1988). In addition, defense counsel had previously cross-examined Barker as to whether he had asked defendant this question, and Barker had denied doing so. In any event, similar evidence was before the jury. Defendant testified that, before he left Barker's car, he had heard on the radio that Trooper Harmon had been killed. He also testified:

> I got to the Interstate and there was ten, fifteen State Patrol cars there. By that time, I knew that there was some truth, that it was true to [sic] *what Barker had said*, that there had been a patrolman killed.

(Emphasis added.) This assignment of error is overruled.

[6] Defendant next assigns error to the admission of certain evidence introduced by the State to show that defendant was on his way to North Carolina to kill his wife. The State called defendant's wife, Marsha McQueen, her friend Ann Sims, and her employer, Carl Fox, who testified that defendant had threatened all three of them before he left Kentucky.

Defendant contends that his wife was compelled to testify and that her testimony was privileged as part of a confidential marital communication. These contentions are meritless. When Marsha McQueen was called to the stand, defendant objected and requested a voir dire to ascertain her competence as a witness. The following exchange took place between Marsha McQueen and defense counsel:

> Q. Mrs. McQueen, are you testifying today voluntarily?
>
> A. Yeah. I talked with you [defense counsel] and you told me if I didn't want to testify, and I don't . . . . If I did not want to come down here I did not want to [sic]. They

could make me come down. He told me he could make me testify.

Q. Told you what?

A. Told me they could make me come to North Carolina but could not make me testify. I felt like if I'm called as a witness I feel like I should.

Q. The result of your testimony today, after being subpoenaed as a witness, you're doing it voluntarily, out of no threats.

A. They told me that I did not have to testify, that I could come down here and refuse.

MR. BROWN: We have no other questions.

Under N.C.G.S. § 8-57(b) Marsha McQueen was competent to testify but not compellable. The privilege of choosing not to testify belonged to the wife, not to defendant. *State v. Britt*, 320 N.C. 705, 709 n.1, 360 S.E. 2d 660, 662 n.1 (1987). *See State v. Freeman*, 302 N.C. 591, 596, 276 S.E. 2d 450, 454 (1981). This colloquy demonstrates that Marsha McQueen was aware of her right to refuse to testify but that she voluntarily chose to do so.

Marsha McQueen testified that defendant had telephoned her and threatened to come to North Carolina and cut her into "little, bitty pieces." Defendant did not object to this testimony at trial, but now argues that, notwithstanding his estrangement from his wife, the testimony was an inadmissible confidential marital communication. In making such a determination

the question is whether the communication, whatever it contains, was induced by the marital relationship and prompted by the affection, confidence, and loyalty engendered by such relationship.

*State v. Freeman*, 302 N.C. 591, 598, 276 S.E. 2d 450, 454. We fail to see how defendant's threat to Marsha McQueen was prompted by the affection, loyalty or confidence engendered by marriage. Threats are not confidential communications. *State v. Britt*, 320 N.C. 705, 360 S.E. 2d 660.

[7] The State moved for permission to question Marsha McQueen about a prior incident in which defendant had used a gun

and made threats against her. The trial court denied the motion, with the proviso that if defendant testified to the incident, then the door to the State's questions would "swing open." Defendant took the stand and on cross-examination admitted, without objection, to the altercation and to the conviction he received stemming from it. Defendant then recalled Marsha McQueen during his case in chief. On cross-examination by the State, she testified as follows:

Q. Mrs. McQueen, calling your attention to the incident at you[r] brother-in-law's — Billy's brother's house — in March of 1984, what did he do on that occasion?

MR. BROWN: Objection.

THE COURT: Overruled.

A. Who are you talking about?

Q. What did Billy McQueen do?

MR. BROWN: Objection.

THE COURT: Overruled.

A. He came into his brother's house with a gun and shot, I thought two times. He shot twice and then he took me out with him.

Defendant argues that this cross-examination was improper because it was an impermissible inquiry into the facts and circumstances surrounding his prior conviction and because it was extrinsic evidence used to impeach him on a collateral matter. We disagree.

Defendant opened the door to the State's questions of Marsha McQueen as a result of his own testimony about the altercation. This evidence was therefore properly admitted. Further, the State's theory of the case was that defendant's presence in North Carolina was founded on his motive and intent to kill his wife, Marsha McQueen. The nature of the prior altercation between defendant and his wife was therefore proper impeachment under N.C.G.S. § 8C-1, Rule 404(b) because it related to his motive for carrying weapons and traveling to this state. Under Rule 404(b), evidence with regard to extrinsic acts is not limited to cross-examination and may be provided by extrinsic evidence. *State v.*

*Morgan*, 315 N.C. 626, 340 S.E. 2d 84 (1986). As defendant correctly notes, evidence of other offenses is inadmissible if its only relevance is to show the character of the accused. However, if that evidence tends to show any other relevant fact, it will not be excluded merely because it also shows him guilty of an independent crime. *State v. Young*, 317 N.C. 396, 346 S.E. 2d 626 (1986). Marsha McQueen's testimony was relevant because it tended to illustrate defendant's intent to get to his wife at anyone's expense and was therefore properly admitted in rebuttal.

[8]  Ann Sims, Marsha McQueen's friend, and Carl Fox, Marsha McQueen's employer, were both called to corroborate Marsha McQueen's testimony that defendant had threatened to kill her on the day before he left Kentucky. Defendant now argues that their corroboration was a collateral matter. This argument is without merit. Carl Fox testified that Marsha McQueen told him she had been receiving harassing and threatening telephone calls from defendant and that he agreed to intercept them. This testimony went to the core of the State's theory that defendant intended to travel from Kentucky to North Carolina to do harm to his wife, or at least to get her back, and that he intended to remove anyone who stood in his way. With regard to Ann Sims, we note that the testimony which is the basis for the assignment of error does not relate to corroboration of Marsha McQueen's testimony. Ann Sims testified that defendant told her on the telephone that he was on his way to Statesville and that "nobody was going to stand in his way of getting—of him doing what he had to do." Again, this was precisely the State's theory of the case. Under N.C.G.S. § 8C-1, Rule 402, the testimony of both Carl Fox and Ann Sims was relevant. It did not address a collateral matter. These witnesses were properly allowed to testify as they did.

[9]  Defendant's final assignment of error relates to the trial court's jury instruction on voluntary intoxication. The trial court charged the jury as follows:

Now, gentlemen—members of the jury, voluntary intoxication is not a legal excuse for crime. However, if you find that the defendant was intoxicated you should consider whether this condition affected his ability to formulate the specific intent which is required for conviction of first degree murder. In order for you to find the defendant guilty of first

degree murder you must find beyond a reasonable doubt that he killed the deceased, Giles Harmon, with malice and in the execution of an actual, specific intent to kill formed after premeditation and deliberation. If, as a result of intoxication, the defendant did not have the specific intent to kill the deceased formed after premeditation and deliberation, *that is, if he was utterly incapable of forming the specific intent to kill,* he is not guilty of murder in the first degree. In such a situation the grade of the offense would be reduced to murder in the second degree.

(Emphasis added.) Defendant objected to the emphasized language. Defendant now contends that under *State v. Mash,* 323 N.C. 339, 372 S.E. 2d 532 (1988), decided three years after defendant's conviction, the emphasized portion of this instruction was sufficiently prejudicial to require a new trial. Although we agree that the emphasized language was erroneous, we do not find prejudicial error.

In *Mash,* we explained that two distinct standards apply when a defendant desires to raise the issue of voluntary intoxication in a criminal case.

A defendant who wishes to raise an issue for the jury as to whether he was so intoxicated by the voluntary consumption of alcohol that he did not form a deliberate and premeditated intent to kill has the burden of producing evidence, or relying on evidence produced by the state, of his intoxication. . . .

The evidence must show that at the time of the killing the defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill. *State v. Shelton,* 164 N.C. 513, 79 S.E. 883 (1913). In absence of some evidence of intoxication to such degree, the court is not required to charge the jury thereon. *State v. McLaughlin,* 286 N.C. 597, 213 S.E. 2d 238 (1975).

*State v. Strickland,* 321 N.C. 31, 41, 361 S.E. 2d 882, 888 (1987) (quoting *State v. Medley,* 295 N.C. 75, 79, 243 S.E. 2d 374, 377 (1978)).

> . . . For the jury, evidence of defendant's intoxication need only raise a reasonable doubt as to whether defendant formed the requisite intent to kill required for conviction of first degree murder in order for defendant to prevail on this issue. *State v. Wilson*, 280 N.C. 674, 187 S.E. 2d 22; N.C.P.I. Crim. 305.11.

*State v. Mash*, 323 N.C. at 346, 372 S.E. 2d at 536-37. In short, to entitle a defendant to a charge on intoxication, the trial judge must conclude that defendant was "utterly incapable" of forming the necessary intent, but the jury need only conclude that "because of his intoxication either defendant did not form the requisite intent or there is at least a reasonable doubt about it." *Id.* at 347, 372 S.E. 2d at 537. A defendant must meet the higher standard of showing that he was "utterly incapable" of forming a deliberated and premeditated intent to kill only for the purpose of entitling himself to the jury instruction. *See State v. Clark*, 324 N.C. 146, 377 S.E. 2d 54 (1989). It follows, therefore, that a jury instruction on voluntary intoxication which itself includes language to the effect that a defendant may be found not guilty of first-degree murder only where his intoxication renders him "utterly incapable" of forming the specific intent to kill is erroneous. The jury instruction given here was in error.

The error in the instruction on voluntary intoxication was not prejudicial in this case, however, because the evidence was insufficient to require such an instruction. We have stated that "[i]n determining whether to give the substance of an instruction concerning a defense, . . . the trial court must . . . assess the evidence first for the legal principles it implicates, and second for the sufficiency of the evidence itself." *Id.* at 161, 377 S.E. 2d at 63. "The measure of what is 'legally sufficient,' however, depends upon the defense asserted." *Id.* at 161, 377 S.E. 2d at 63. "Evidence of mere intoxication . . . is not enough to meet defendant's burden of production [before the trial judge]. He must produce *substantial* evidence which would support a conclusion by the judge that he was so intoxicated that he could not form a deliberate and premeditated intent to kill." *State v. Mash*, 323 N.C. at 346, 372 S.E. 2d at 536 (emphasis added). Our scrutiny of the transcript convinces us that, even taken in the light most favorable to him, *State v. McCray*, 312 N.C. 519, 324 S.E. 2d 606 (1985), defendant nevertheless failed to produce *substantial* evidence to

show that he was so intoxicated that he could not form a deliberate and premeditated intent to kill. The combined testimony of defendant and Charles Barker shows that during the afternoon and evening before the two left Kentucky for North Carolina, they consumed half a case of beer and a fifth of whiskey. Defendant testified that he and Barker also took some Valium pills. Defendant stated that during the journey to North Carolina, the men stopped twice to buy beer, once at a gas station and again at a convenience store. Defendant could not recall the exact amount purchased, but Barker testified that they bought either one or two six-packs plus two quarts at the convenience store. Defendant testified that he drank an unspecified quantity of beer while in the Newport, Tennessee, motel on the afternoon of the shooting and that both men slept for some time. Defendant testified that he and Barker were "hung over" on the morning after the shooting. Defendant's expert medical witness testified that defendant was an alcoholic and was "very possibl[y]" suffering an alcoholic blackout during the evening of the shooting.

In the light most favorable to defendant, this testimony shows that on the day before the shooting, defendant and Barker drank half a case of beer and one fifth of whiskey between them. On the day of the shooting, defendant and Barker *bought* at least one six-pack, two quarts and a further unspecified amount of beer. There is no definitive evidence as to who *drank* what amount. Both men slept before driving from Tennessee into North Carolina. In short, the evidence might support an inference that defendant was intoxicated, but it would not support a conclusion that defendant was intoxicated to the extent that he was "utterly incapable" of forming the specific intent to kill after premeditation and deliberation. " '[A] person may be excited, intoxicated and emotionally upset, and still have the capability to formulate the necessary plan, design, or intention to commit murder in the first degree.' " *State v. Hamby*, 276 N.C. 674, 678, 174 S.E. 2d 385, 387 (1970) (quoting *State v. Thompson*, 110 Utah 113, 123, 170 P. 2d 153, 158 (1946) ). A trial judge should not give instructions that are not supported by a reasonable view of the evidence. *State v. Lampkins*, 283 N.C. 520, 196 S.E. 2d 697 (1973). We conclude that defendant was not entitled to *any* jury instruction on the issue of voluntary intoxication. Although the evidence was insufficient to warrant the trial court charging the jury on this issue, defendant

received the benefit of an instruction. The error in the instruction was favorable to defendant. This assignment of error is overruled.

We hold that defendant received a fair trial, free from prejudicial error.

No error.

Chief Justice EXUM dissenting.

I differ from the majority with respect only to its conclusion that there was no reversible error in the trial court's instruction on voluntary intoxication. The majority rightly concludes there was error in the instruction but, I think, wrongly concludes that the error was harmless because there was no evidentiary support for such an instruction.

As the majority recognizes, the test for determining whether a voluntary intoxication instruction should be given in a first degree murder prosecution is this: The instruction should not be given unless there is substantial evidence to support a conclusion that defendant was so intoxicated that he could not form, or was utterly incapable of forming, a deliberate and premeditated specific intent to kill. *State v. Mash*, 323 N.C. 339, 372 S.E. 2d 532 (1988). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E. 2d 164, 169 (1980). It is for the trial judge, in the first instance, to determine whether this test has been met and for the appellate court, finally, to decide whether the trial court made the correct determination.

The test is properly a stringent one in order to ensure that voluntary intoxication will be available to reduce a defendant's culpability only in the most compelling cases. Nevertheless, I believe the evidence here meets the test. Indeed, in some ways, the evidence here epitomizes that kind of evidence which entitles a defendant to this instruction.

The majority itself correctly capsules defendant's position at trial by saying, "Defendant's version of the events was that he was suffering an alcoholic blackout or that Charles Barker had committed the crime." One who is suffering from an "alcoholic blackout" at the time a crime is committed epitomizes a defend-

ant who is so intoxicated that he cannot form a deliberate and premeditated specific intent to kill.

There is considerable evidence which supports this, the defendant's, version of the events. Much of it is recited in the majority opinion. It is the principal basis for the defense proffered in this case.

As the majority correctly states, the testimony of both Barker, the state's principal witness, and defendant, an alcoholic, tends to show that the two consumed half a case of beer and a fifth of whiskey during the afternoon and evening of April 8, before they left Kentucky for North Carolina. (Defendant also testified that on the morning of April 8 he was "hung over," having consumed an unspecified quantity of alcohol the night before.) During their trip to North Carolina, the two stopped twice to buy beer—one or two six-packs plus two quarts, according to Barker. (Defendant testified they purchased "a sackful of beer.")

Defendant testified as follows: He and Barker checked into a motel in Newport, Tennessee, in the early morning hours of April 9. At the motel, the name and location of which defendant could not recall, the two "were drinking beer." Defendant went to sleep. When he "came to" Barker had his arm over him. Defendant pushed Barker off the bed, and they fought with each other. Defendant "was somewhat sober then." Defendant threatened to leave and hitchhike to Statesville, but instead he decided to "go down to the supermarket and get some more beer and to cool off." He took the beer back to the motel room, "and I went in and we started to drink." Defendant remembered "taking some pills." Defendant and Barker continued to argue. "We would argue some. We would get drunk some. Then things would kind of cool down . . . ." Defendant said, "I started to just go on and hitchhike. I was drunk. We were drinking . . . . I barely remember leaving the motel room. I remember I was falling and I remember [Barker] had to help me some." The next thing defendant recalled was the morning after the shooting "being in the front seat of the car and it was just getting daylight. I woke up. I was sick from . . . felt bad from drinking. . . . I didn't know where we was at."

Defendant called as a witness Dr. Anthony Sciara, a forensic psychologist and Director of Psychological Services at Appalachian Hall. Dr. Sciara testified to his extensive experience treating

alcoholics at Appalachian Hall and elsewhere. He testified at length regarding the various examinations and tests he administered to defendant, reports from other institutions about defendant which he considered, and interviews he conducted with defendant. He told the jury that in his opinion, based on all he had considered, defendant was an alcoholic and on the night of the crime "it is unlikely that [defendant] possessed the ability to form a particular intent to shoot the trooper." It seems clear from all the testimony of Dr. Sciara that this inability was due to defendant's consumption of alcohol during the period of time preceding the shooting and certain "psychological problems relating to alcoholism." There is simply nothing else referred to in the record, or in Dr. Sciara's testimony, that could have produced this inability to form a deliberate and premeditated intent to kill. This view of the basis for Dr. Sciara's opinion is supported by Dr. Sciara's further testimony on redirect examination that, "It is my opinion that it is very possible that [defendant] was suffering from a blackout [at the time of the killing] because of the amount of alcohol ingested during the previous twenty-four hours and the restriction of his memory and his behavior."

I must conclude, therefore, that the evidence was sufficient to require the voluntary intoxication instruction. Such an instruction would not, of itself, entitle defendant to an acquittal; it goes merely to the degree of defendant's culpability. Should the jury, because of this evidence and with proper instructions, have a reasonable doubt about whether defendant had a deliberate and premeditated specific intent to kill, it would not acquit him; it would find him guilty of second degree, rather than first degree, murder. As we said recently in *Mash*, 323 N.C. at 349-50, 372 S.E. 2d at 538-39:

> Although there is little question that defendant committed a homicide, the case is relatively close on the degree of his culpability. The closeness is due to . . . the substantial evidence of defendant's intoxication at the time he committed the crime . . . . The central issue for the jury . . . was whether defendant should be found guilty of first or second degree murder; and this issue hinged largely on how the jury would consider the evidence of defendant's intoxication. For these reasons . . . had the error in the instructions on intox-

ication not been made, there is a reasonable possibility that a different result would have obtained at trial.

I must also conclude, therefore, that the error here in the voluntary intoxication instruction entitles this defendant, as it did the defendant in *Mash*, to a new trial.