STATE OF NORTH CAROLINA v. EUGENE FRANKLIN VAUGHN

No. 83A88

(Filed 5 April 1989)

**1. Homicide § 18.1— murder—premeditation and deliberation—evidence sufficient**

   The evidence was sufficient in a noncapital prosecution for first degree murder to show premeditation and deliberation where the evidence showed that, after a confrontation between defendant and the victim, defendant went to his trailer and got his gun; defendant told the woman who lived with him, Nellie Cayton, that the victim had beaten him and that if he beat him any more, he would shoot him; Cayton then called Barbara Lewis and said that defendant had a gun and had said that he was going to shoot the victim, Fritz Lewis; as the victim and two others approached Barbara Lewis's trailer, defendant backed into an adjacent driveway and motioned for Lewis to come over; when Lewis, who was unarmed, got within three to five feet of defendant's truck, defendant stuck his gun out of the window and shot Lewis; defendant told Lewis to get up after he fell; defendant pointed the gun at one of the others and told her that he would shoot her too; defendant gave a bystander two live shells and asked him to do something with them; defendant did not attempt to help the victim, but rather sat in his truck and looked at him; defendant told an emergency medical technician that the victim would not breathe because he had taken a gun and blown his brains out; there was testimony

that it was necessary before firing the gun to load it, close it, and cock it before pulling the trigger; and there was evidence that defendant reloaded the gun after shooting the victim.

**2. Homicide § 8.1— murder—premeditation and deliberation—intoxication**

No inference of the absence of premeditation and deliberation arises from intoxication, as a matter of law.

**3. Homicide § 8.1— murder—intoxication—erroneous instruction—no prejudice**

The trial court erred in a prosecution for first degree murder by instructing the jury on voluntary intoxication that "the evidence must show that at the time of the killing the defendant's mind and reason was so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill." The error was not prejudicial because the evidence was insufficient to require an instruction on voluntary intoxication.

**4. Homicide § 30.2— murder—failure to instruct on manslaughter—no error**

There was no prejudicial error in a first degree murder prosecution from the court's denial of defendant's request to instruct the jury on voluntary manslaughter where the jury was properly instructed on first degree murder and second degree murder and the jury returned a verdict of guilty of first degree murder.

**5. Homicide § 15— murder—testimony as to defendant's behavior when angry—not prejudicial**

There was no prejudice in a prosecution for first degree murder from the State's questioning of a woman with whom defendant lived regarding his behavior when angry because, assuming error, the testimony tended to show that defendant had no special propensity toward violence and that the woman had provoked defendant's anger toward her. N.C.G.S. § 15A-1443(a).

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) (Cum. Supp. 1988) from the imposition of a sentence of life imprisonment upon his conviction of first degree murder before *Lewis, John B., Jr., J.,* at the 16 November 1987 Criminal Session of Superior Court, BEAUFORT County. Heard in the Supreme Court 14 February 1989.

*Lacy H. Thornburg, Attorney General, by Doris J. Holton, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Gordon Widenhouse, Assistant Appellate Defender, for defendant-appellant.*

WHICHARD, Justice.

In a non-capital trial, defendant was convicted of the first degree murder of Fritz Lewis and sentenced to life imprisonment. We find no error.

The State's evidence, in pertinent summary, showed the following:

On 25 August 1987, defendant gave Fritz Lewis, Joann Clark and Carey White a ride in his truck to the home of Wendy Clark, Joann Clark's sister. Defendant drank from a liquor bottle as he drove; the three passengers drank beer. Defendant stopped the truck at a dumpster for Joann Clark and White to urinate. When they returned to the truck, defendant and Lewis were arguing and cursing at each other. Lewis told White and Clark that defendant said he had seen Clark naked twice. Clark was Lewis' girlfriend. She told Lewis that defendant's statement was not true. Lewis said to defendant, "We ought to fight." Clark took over the driving, and defendant and Lewis calmed down. After defendant and his passengers got to Wendy Clark's house, defendant left. Wendy Clark drove Lewis, White and Joann Clark back to Lewis Grocery. On their way they passed defendant in his truck. When they arrived at the grocery store, they sat outside and drank beer. Wendy Clark left.

While Lewis, White and Joann Clark were outside the store, defendant drove by in his truck and turned down the road heading toward his house. Lewis asked Joann Clark, "It ain't so, is it baby?" She replied, "You know it ain't." Lewis ran from the store through the woods toward defendant's house. He returned about five minutes later, out of breath. White asked Lewis, "Did you take care of it?" Lewis responded, "Taken care of."

Defendant returned to his trailer. He went to the bedroom and asked Nellie Cayton, who lived with him, "Where is it at?" He then came out of the bedroom with his shotgun. Defendant told Cayton that Fritz Lewis "beat the hell out of [me]." Cayton testified that defendant's eye was swollen and bruised and his cheekbone was blue. Defendant told Cayton that if Lewis beat him anymore he would shoot him. Defendant then left his home, driving "real slow." Cayton testified that defendant was drunk, was not walking very well, and had trouble getting to the door.

Cayton called Barbara Lewis at Lewis Grocery and told her that defendant had a gun and that he said he was going to shoot Fritz Lewis. Cayton advised her to get Lewis, White and Clark away before defendant arrived.

Barbara Lewis went outside and told White to get Lewis away because defendant was on his way to the store to shoot him. White suggested that they go back to the house. Lewis, White and Clark left the store and returned through the woods to Lewis and Clark's trailer. As they got near the trailer, they saw defendant in his truck. Defendant looked at them, stopped the truck, and backed it into the driveway of Greg Scaggs, who lived next to Lewis and Clark. Defendant motioned for Lewis to come over. Lewis, who was unarmed, began walking toward defendant's truck, telling Clark, "Well, I'm going to go see what he's got to say now." When Lewis got within three to five feet of the truck, defendant stuck the barrel of his shotgun out the window. Lewis threw his arm up and defendant shot him. After Lewis fell, defendant said, "Now, get up." Clark ran toward Lewis. Defendant pointed the gun at her and told her that he would shoot her head off too. Defendant pointed the gun back and forth at Clark and Lewis and would not let Clark go near Lewis.

Scaggs walked around the truck and saw Lewis lying on the ground, bleeding from his head. He went to the passenger's side of the truck and got the shotgun from defendant. He took the gun into his house, wiped fingerprints from it, then went back to the truck and put the gun inside. Defendant handed Scaggs two live shells and told him to do something with them. Scaggs threw them in the woods.

Mary Ann Lewis, Clark's grandmother, arrived on the scene. She went up to the truck and asked defendant why he did it. He said, "Ma, I ain't taking a beating from no damn body." She saw blood on defendant's cheeks and thought he was drunk. She asked him if he was sorry and he said he was. Lewis was still breathing. Defendant stayed in his truck, smoking cigarettes and looking at Lewis.

When an emergency medical technician arrived and began administering CPR to Lewis, defendant said, "Baby, he ain't going to breathe because I took a gun and I blowed his f---ing brains out." Lewis died on the way to the hospital.

Several hours after the shooting, Deputy Sheriff Ray Manning commented to defendant, "That's a nasty looking mouse under your eye." Defendant responded, "Yeah, that's why that gun went off." Manning testified that the wound under defendant's eye was red and dark. Manning gave his opinion that defendant was intoxicated but not drunk. Manning testified that he removed an unfired slug from defendant's gun.

Lewis died of a gunshot wound to his head. Dr. Page Hudson, the pathologist who performed the autopsy, estimated that the end of the gun was approximately four feet, give or take a foot, from Lewis' head when it was fired. Special Agent Eugene Bishop, a firearms expert with the SBI, testified that the gun had to be loaded, closed, and cocked before being fired.

Defendant offered no evidence.

[1] Defendant first contends that the trial court erred in failing to grant his motion to dismiss the first degree murder charge. He argues that the State's evidence was insufficient to show premeditation and deliberation.

Premeditation and deliberation are necessary elements of first degree murder based on premeditation and deliberation (as opposed to other bases for first degree murder set forth in N.C.G.S. § 14-17 (1986)). *State v. Jackson*, 317 N.C. 1, 23, 343 S.E. 2d 814, 827 (1986), *vacated on other grounds*, 479 U.S. 1077, 94 L.Ed. 2d 133 (1987). Premeditation means that the defendant thought out the act beforehand for some length of time, however short. *Id.* "Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *Id.* The State may prove the elements of premeditation and deliberation by circumstantial evidence as well as by direct evidence. *Id.* Among the circumstances to be considered in determining whether a defendant acted after premeditation and deliberation are the want of provocation by the victim, the defendant's conduct and statements before and after the killing, and threats and declarations by the defendant before and during the course of the occurrence giving rise to the death of the victim. *Id.*

The evidence in this case shows that after a confrontation between defendant and Lewis, defendant went to his trailer and got his gun. He told Nellie Cayton that Lewis had beaten him and that if he beat him anymore he would shoot him. After defendant left, Cayton called Barbara Lewis and said that defendant had a gun and had said he was going to shoot Lewis. As Lewis, Clark, and White approached Lewis and Clark's trailer, defendant backed into an adjacent driveway and motioned for Lewis to come over. When Lewis, who was unarmed, got within three to five feet of defendant's truck, defendant stuck his gun out of the window and shot Lewis. After Lewis fell, defendant told him to "get up." Defendant pointed the gun at Clark and told her that he would shoot her too. Defendant gave Scaggs two live shells and asked him to do something with them. Defendant did not attempt to help Lewis; rather, he sat in his truck and looked at him. He told an emergency medical technician that Lewis would not breathe because he had taken a gun and blown his brains out. There was testimony that to fire the gun, it was necessary to load it, close it, and cock it before pulling the trigger. There is evidence that defendant reloaded the gun after shooting Lewis. The foregoing evidence is sufficient to support a jury finding of premeditation and deliberation.

[2] Defendant argues that the uncontroverted evidence shows that he was intoxicated and that he therefore could not have deliberated. This contention is unavailing because "[n]o inference of the absence of deliberation and premeditation arises from intoxication, as a matter of law." *State v. Mash*, 323 N.C. 339, 347, 372 S.E. 2d 532, 537 (1988) (quoting *State v. Murphy*, 157 N.C. 614, 619, 72 S.E. 1075, 1077 (1911) ).

[3] Defendant next contends that the trial court erred in failing to give the pattern jury instruction on voluntary intoxication. Rather, it gave the following instruction, in pertinent part:

Voluntary drunkenness is not a legal excuse for crime. The evidence must show that at the time of the killing the *[d]efendant's mind and reason was so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill.* Intoxicated and drunk have similar if not the same meaning in the law. According to the dictionaries, they are sometimes referred

one to the other. Do not attempt to make any distinction between drunk and intoxicated insofar as this case is concerned.

A person may be under the influence as referred to in the Motor Vehicle Law, or referred to as intoxicated, and be quite capable of carrying out a specific intent to kill. The breathalyzer readings and so forth that are done in motor vehicle cases have no application here insofar as this evidence is concerned.

The influence of intoxication under question of existence of premeditation depends upon its degree and its effect upon the mind and passion. *For it to constitute a defense it must appear that the [d]efendant is not able by reason of drunkenness to think out beforehand what he intended to do, and to weigh it and understand the nature and consequences of his act.*

(Emphasis added.) Defendant argues that the italicized portions of the instruction improperly relieved the State of its burden of proof, citing *State v. Mash*, 323 N.C. 339, 372 S.E. 2d 532.

In *Mash*, we held that the following modification to the pattern jury instruction, *see* N.C.P.I.—Crim. 305.11, was improper:

[T]he intoxication must be so great that his mind and reason were so completely overthrown so as to render him utterly incapable to form a deliberate and premedi[t]ated purpose to kill. Mere intoxication cannot serve as an excuse for the defendant. It must be intoxication to the extent that the defendant's mental processes were so overcome by the excessive use of liquor or other intoxicants that he had temporarily, at least, lost the capacity to think and plan.

*Id.* at 345, 372 S.E. 2d at 536. This instruction was erroneous because "[f]or the jury, evidence of defendant's intoxication need only raise a reasonable doubt as to whether defendant formed the requisite intent to kill required for conviction of first degree murder in order for defendant to prevail on this issue." *Id.* at 346, 372 S.E. 2d at 537. Likewise, in this case, the court's instruction on voluntary intoxication states, also erroneously, that "[t]he evidence must show that at the time of the killing the [d]efendant's mind and reason was so completely intoxicated and over-

thrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill."

This error was not prejudicial, however, because the evidence was insufficient to require an instruction on voluntary intoxication. *State v. McQueen*, 324 N.C. 118, 141, 377 S.E. 2d 38, 51 (1989). To be entitled to an instruction on voluntary intoxication, a defendant "must produce substantial evidence which would support a conclusion by the judge that he was so intoxicated that he could not form a deliberate and premeditated intent to kill." *Mash*, 323 N.C. at 346, 372 S.E. 2d at 536. The defendant must show "that at the time of the killing the defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill." *Id.* "Evidence of mere intoxication . . . is not enough to meet defendant's burden of production." *Id.* "[A] person may be excited, intoxicated and emotionally upset, and still have the capability to formulate the necessary plan, design, or intention to commit murder in the first degree." *Id.* at 347, 372 S.E. 2d at 537.

Several witnesses testified as to whether defendant appeared to be intoxicated. Clark testified that defendant had been drinking but was not drunk, that he was aware of what was going on around him, and that his statements were serious, coherent and rational. White testified that defendant was intoxicated, but that most of his statements made sense, that he was responsive, and that he appeared to know what was going on around him. Scaggs testified that defendant was slightly intoxicated and that he smelled of alcohol. Deputy Sheriff Joe Bell, who arrested defendant, testified that defendant was responsive, behaved appropriately, and walked unassisted. He testified that he did not detect alcohol on defendant. Mary Ann Lewis testified that defendant was drunk, but was no drunker than usual. Cayton testified that defendant was drunk, was not walking very well, and had trouble getting to the door. However, she said that his questions were "appropriate and responsive," that he knew what was going on around him, and that he walked unassisted to his truck. Deputy Sheriff Ray Manning testified that defendant "was intoxicated," but "was not drunk."

In deciding whether the evidence was sufficiently substantial to entitle defendant to an instruction on voluntary intoxication, we must consider the evidence of intoxication in the light most favorable to defendant. *Id.* In the light most favorable to defendant, the evidence shows that he was intoxicated and had some trouble walking. However, there is no testimony that he behaved inappropriately, that his statements were irrational or incoherent, or that he was unaware of what was going on around him. The evidence thus was insufficient to require any instruction on voluntary intoxication, and we thus cannot find prejudicial error from the instruction given.

[4] Defendant next contends that the trial court erred in denying his request to instruct the jury on voluntary manslaughter. Assuming arguendo that the evidence supported such an instruction, the trial court's failure to give it was harmless. This Court has held that where a jury is properly instructed on first degree murder and second degree murder, and the jury returns a verdict of guilty of first degree murder, the failure to instruct on voluntary manslaughter is harmless error. *State v. Tidwell*, 323 N.C. 668, 674-75, 374 S.E. 2d 577, 581 (1989); *State v. Judge*, 308 N.C. 658, 664-65, 303 S.E. 2d 817, 821-22 (1983).

[5] Finally, defendant contends that the court erred in overruling his objections to part of the State's direct examination of Nellie Cayton. The State questioned Cayton as follows about defendant's behavior when he went to his trailer and got his gun:

Q. Was he mad? Have you seen him when he was mad?

A. He didn't say nothing ill nor hateful to me, and he didn't cuss at me, so I don't know whether he was mad or not.

Q. Has he ever cussed at you or been ill or mad at you before?

A. Well, if you live with me, I have an idea the next one will get mad with me at times.

[Defense Counsel:] OBJECTION, MOVE TO STRIKE THE STATEMENT.

THE COURT: OVERRULED.

Q. Has he?

A. Has he what?

Q. Gotten mad and upset with you?

[Defense Counsel:] OBJECTION.

OVERRULED.

Q. Has he ever got [the murder weapon] out after you before?

[Defense Counsel:] OBJECTION.

OVERRULED.

A. No sir.

Defendant argues that this testimony was irrelevant and that it was prejudicial because it sought to have the jury convict him on the basis of his bad character. Assuming error, we conclude that the testimony failed to prejudice defendant because it tended to show that defendant had no special propensity toward violence and that Cayton had provoked defendant's anger toward her. N.C.G.S. § 15A-1443(a) (1988).

For the reasons stated, we find that defendant received a fair trial, free from prejudicial error.

No error.