STATE OF NORTH CAROLINA v. MIGUEL AGUILAR RIOS, DEFENDANT

No. COA04-706

(Filed 5 April 2005)

## 1. Homicide— first-degree murder—failure to instruct on second-degree murder—failure to instruct on voluntary intoxication

The trial court did not err in a first-degree murder case by failing to instruct the jury on second-degree murder based on voluntary intoxication, because: (1) the evidence was overwhelming that defendant was not intoxicated; (2) defendant's confession contained a detailed account of the murder, but no mention about ingesting alcohol or drugs; (3) viewing the evidence in the light most favor to defendant, even the testimony of his witnesses did not meet the test for submission of an instruction on voluntary intoxication; (4) defendant never testified that he was so intoxicated that he could not premeditate or form a fixed purpose to kill; and (5) the State's evidence of premeditation and deliberation for first-degree murder was very strong.

## 2. Criminal Law— trial court questioning witnesses—no impression court working with prosecution

The trial court did not abuse its discretion in a first-degree murder case by questioning witnesses and the court's questions did not give the jury the impression that the trial court and the prosecution were working together, because: (1) no one could reasonably infer from the exchanges between the trial court and

STATE v. RIOS

[169 N.C. App. 270 (2005)]

the witness that the court was expressing an opinion as to what facts had been proven; (2) the trial court questioned the witness to clarify a critical element of the case; and (3) in this bilingual trial, the court fulfilled its duty to make the proceedings as clear and easy to understand as possible for the interpreters, witnesses, defendant, and the jury.

### 3. Criminal Law— instruction—flight

The trial court did not commit plain error in a first-degree murder case by giving an instruction on flight, because: (1) there was evidence that defendant left the scene and took steps to avoid apprehension including that he drove down two streets at night with the lights of the car turned off when he left the scene of the shooting; and (2) failure to render assistance to the victim is a factor to be considered in giving the flight instruction.

### 4. Homicide— first-degree murder—short-form indictment— constitutionality

The short-form indictment used to charge defendant with first-degree murder was constitutional even though it failed to list all the necessary elements of first-degree murder.

Appeal by defendant from judgment filed 19 December 2003 by Judge Michael E. Helms in Guilford County Superior Court. Heard in the Court of Appeals 27 January 2005.

*Attorney General Roy Cooper, by Assistant Attorney General Daniel P. O'Brien, for the State.*

*Appellate Defender Staples S. Hughes, by Assistant Appellate Defender Anne M. Gomez, for defendant.*

BRYANT, Judge.

Miguel Aguilar Rios (defendant) appeals his judgment filed 19 December 2003, entered consistent with a jury verdict finding him guilty of first-degree murder.

On 4 August 2003, defendant was indicted for the first-degree murder of Shahid Iqbal (Iqbal). This matter came for jury trial at the 15 December 2003 criminal session of Guilford County Superior Court with the Honorable Michael E. Helms presiding. The jury found defendant guilty as charged on 18 December 2003. By judgment filed 19 December 2003, defendant was sentenced to life

imprisonment without parole. Defendant gave notice of appeal in open court.

*Facts*

The State presented the following evidence at trial: The security-system videotape from Sam's Mini-Mart in High Point, North Carolina showed that at 8:15 p.m. on 19 April 2003, Abel Medina (Medina) (co-defendant) bought a 12-pack of beer. Several minutes later, Medina re-entered the store, bought a pack of cigarettes, and stayed at the counter for several more minutes after completing the purchase.

The videotape then showed defendant entering the store, pulling his shirt over his face with one hand, and carrying a semi-automatic gun with the other. Defendant walked directly to the counter and fired a shot at Iqbal, the store clerk. The gun then jammed. Defendant released his shirt and used both hands in order to clear the jam, revealing his face to the video camera. Defendant then leaned over the counter and fired another shot before pulling his shirt over his face again and leaving the store. Iqbal was then seen moving past the video camera to the telephone.

Bystanders who heard the shots saw two subjects running out of the store—Medina fleeing on foot and defendant running to his car. Defendant left the lights of his car off as he pulled out and drove down Foust and Green Streets. The bystanders who heard the shots and saw the car flee with its lights off, looked inside the store, saw the blood, and called 911. Iqbal, who was lying on the floor, was breathing with difficulty. Iqbal had called his parents' house on the telephone but was only able to say that somebody had shot him, before collapsing.

The initial broadcast of "shots fired" went out to law enforcement at 8:17 p.m. Police officers began arriving at the scene within minutes of the broadcast. EMS took Iqbal to the hospital where he later died from the gunshot wound.

At 8:24 p.m., officers driving to the scene observed a man walking on foot northwards on Green Street, approximately 200-300 yards from the store. Because most people tend to stare at a line of police cars going by, officers stopped Medina as he appeared to be turning away and hiding his face. The officers asked Medina in Spanish whether he had heard shots from the store or knew anything about the shooting. He said he did not. After obtaining his name and review-

ing his identification, the officers released Medina and proceeded on to the scene of the crime.

At 8:26 p.m., Lieutenant J.C. Blank of the High Point Police Department arrived at the store and spoke briefly with some of the officers who were already on the scene. Lt. Blank then went directly to the video monitoring system behind the counter and observed the video camera. He rewound the videotape and on the monitor saw Medina buying a 12-pack of beer, leaving the store, then minutes later, re-entering the store and buying a pack of cigarettes.

Lt. Blank continued viewing the videotape which showed defendant entering the store, pulling his shirt up over his face, and shooting at the clerk once. Then, while clearing a jam with both hands, defendant's shirt dropped, and defendant's face was clearly shown as he leaned over the counter and fired again. Thereafter, Lt. Blank called in the officers who had stopped Medina, had them view the videotape, and sent them out to locate the two men.

At 8:52 p.m., the officers' search led them to 1122 Textile Place. A small dark-colored car, meeting the witnesses' description of the car that left the scene with its lights off, was backed into the driveway, parallel to the car immediately next to it. An unopened and still cold 12-pack of beer was on the floorboard, and the engine of the car was warm. Through a window of the house, the officers observed defendant standing in the front room.

The officers knocked and received entry to the house. Defendant resisted arrest and attempted to flee, requiring two officers to handcuff him. Defendant then dropped onto a cot and hunched over. While Officer John Gianella of the High Point Police Department was searching him for weapons, defendant kept turning his body so that the officer could not search his stomach area. After putting defendant on his back, Officer Gianella discovered a 9mm semi-automatic gun[1] in defendant's pants immediately below defendant's belt and down in the groin area. The officers cleared the weapon and removed the magazine. Defendant had a second magazine in his back pocket.

Defendant and Medina were separated from each other and from the other three occupants of the house (Julio Reyes, Gabriel Solez, and Mary Alta Wainwright). As defendant sat in a chair in the bed-

_____

1. Ballistics testing by SBI later confirmed that the cartridges found on the floor of the store and the projectile embedded in the wall came from this gun, to the exclusion of all other weapons. An SBI gunshot residue test performed on defendant also confirmed he had fired a weapon.

STATE v. RIOS

[169 N.C. App. 270 (2005)]

room, he hunched over and moved from side to side. Officer Gianella asked defendant in Spanish if he was drunk. Defendant replied he did not like beer, but was sick[2]. Officer Gianella noted defendant had no problem walking, even with his hands cuffed behind his back, did not have slurred speech, had no odor of alcohol on his person, did not have bloodshot eyes, and was able to follow Officer Gianella's directions.

Police attempted to interview the other occupants of the house. Wainwright, who also testified at trial, said that Medina, Reyes, and Solez rented the house, and defendant was just visiting. Wainwright said Solez had invited her in earlier in the afternoon and gave her a beer. At one point before it got dark, defendant and Medina left, but Medina returned about a half-hour later and was crying. Five to ten minutes after that, defendant returned. Defendant was not drinking beer at this time, and most of the times Wainwright saw him that night, he was not drinking beer. In addition, at some point in the evening, defendant kissed her on the cheek and she smelled no odor of alcohol on his breath. Reyes said defendant and Medina had left the house and were not gone long, that Medina returned first, and thirty minutes later defendant returned. Solez was too intoxicated to be interviewed.

Around 9:30 p.m., defendant was transported from 1122 Textile Place to the police station, where he was processed, including having a gunshot residue test performed on him, and was placed in a holding cell at 10:20 p.m. Officer R. L. Cecil of the High Point Police Department, who maintained custody and visual contact with defendant at all times, testified that he observed in defendant no indications of intoxication, no slurred speech, no glazed eyes, no stumbling, or poor body functioning. Officer Cecil also testified that defendant walked normally and under his own power, with his hands cuffed behind his back, and needed nothing to lean on.

At 11:45 p.m., Detective Mike Nixon of the High Point Police Department and Officer Gianella, interviewed defendant, reading him his rights in both English and Spanish. Defendant indicated orally (sometimes in English, sometimes in Spanish) and in writing that he understood his rights and he agreed to waive them in order to talk. After defendant and Officer Gianella "bonded" and could understand each other, most of defendant's confession was in Spanish.

2. At trial, defendant testified that he was ill that day and had a sore throat. Officer Gianella testified he specifically remembered defendant's statement that he did not like beer.

At first, defendant denied any involvement in the shooting or being in the store, or knowing anything about the shooting. Thereafter, Det. Nixon showed him the videotape, and defendant confessed that he shot Iqbal. Defendant said that "the Pakistani" had offended Medina while buying the beer. Defendant said he was outside the store at the time, but overheard Medina and the clerk arguing. After this, he and Medina went back to 1122 Textile Place, and Medina had told him that the clerk had called him a "mother-f[*]cking wetback" when he was buying beer. They then went back to the store ten to fifteen minutes later. Defendant admitted that he was angry about the whole situation between Medina and the clerk.

Defendant said Medina had asked him to come into the store and defend him. So, the second time Medina went in, he bought cigarettes. Defendant admitted he went in because Iqbal had offended Medina and he wanted "to speak bad to [Iqbal]" about it. As defendant entered the store, Iqbal said to defendant, "Don't put your feet on the floor, you f[*]cking wetback." Iqbal also made a comment concerning defendant's father. Defendant admitted he did not like Pakistanis. Defendant admitted he got "madder" after Iqbal's comments to him, and that is when he pulled the gun and shot Iqbal. At this point in the interview, defendant asked Det. Nixon when he could go home. Det. Nixon told him, "No time soon," and that the man he shot was dead—defendant thought Iqbal was still alive. Det. Nixon asked defendant how he felt about killing Iqbal. Defendant said a lot of Mexicans and Americans were dead because of problems with some Middle Eastern countries. He said he had not had problems with Pakistanis before, but he did not go to that particular store because he did not like Pakistanis.

Defendant never said in his interview that he was drunk or intoxicated or that he had been drinking at all. Further, Det. Nixon testified he was within two to four feet of defendant during the interview, and he did not detect any impairment or any odor of alcohol. He noted no bloodshot eyes and no slurred speech. He testified defendant did not need help to get up or to walk, defendant walked without stumbling, and Det. Nixon did not believe defendant to be impaired or intoxicated. Defendant was then charged with first-degree murder. While being taken to the magistrate's office, defendant spontaneously asked Officer Cecil, in English, "How long do you think I'll be in jail, a year or two?"

Defendant presented as witnesses Medina, his cousin Flavio Soto Ramirez, and himself. All three testified defendant had been drinking

the night in question and was very drunk. Defendant testified he remembered Iqbal insulting him and his father, but he said he did not remember walking over to him and shooting him in the chest, the gun jamming, or leaning over to shoot a second time. He then recanted and testified he did remember shooting Iqbal, but did not remember the details.

The issues on appeal are whether: (I) the trial court properly declined to instruct the jury on second-degree murder based on voluntary intoxication; (II) the trial court erred by questioning witnesses and giving the jury the impression that the trial court and the prosecution were working together; (III) the trial court committed plain error in giving an instruction on flight; and (IV) use of a short-form murder indictment violated defendant's constitutional rights in that the indictment failed to list all the necessary elements of first-degree murder.

I

[1] Defendant first argues that the trial court erred in failing to instruct the jury on second-degree murder. We hold that defendant was not entitled to an instruction on voluntary intoxication (as was provided by the trial court) and, further, was not entitled to an instruction on second-degree murder (as the trial court properly declined to instruct the jury).

The test of whether a defendant is entitled to an instruction on voluntary intoxication is as follows:

A defendant who wishes to raise an issue for the jury as to whether he was so intoxicated by the voluntary consumption of alcohol that he did not form a deliberate and premeditated intent to kill has the burden of producing evidence, or relying on evidence produced by the state, of his intoxication. Evidence of mere intoxication, however, is not enough to meet defendant's burden of production. He must produce substantial evidence which would support a conclusion by the judge that he was so intoxicated that he could not form a deliberate and premeditated intent to kill.

. . .

The evidence must show that at the time of the killing the defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a delib-

erate and premeditated purpose to kill. In [the] absence of some evidence of intoxication to such degree, the court is not required to charge the jury thereon.

*State v. Mash*, 323 N.C. 339, 346, 372 S.E.2d 532, 536 (1988) (internal quotations and citations omitted).

Further, where a court gives an instruction on voluntary intoxication in a case where the defendant is not entitled to it, the defendant receives a benefit. *State v. McQueen*, 324 N.C. 118, 142-43, 377 S.E.2d 38, 52 (1989). In *McQueen*, the Court concluded "that defendant was not entitled to any jury instruction on the issue of voluntary intoxication. Although the evidence was insufficient to warrant the trial court charging the jury on this issue, defendant received the benefit of an instruction. The error in the instruction was favorable to defendant. This assignment of error is overruled." *Id.*

Here, the evidence was overwhelming that defendant was not intoxicated, much less "so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill." *Mash*, 323 N.C. at 346, 372 S.E.2d at 536. The videotape showed him walking to Iqbal and shooting, with no unsteadiness or loss of balance, even when leaning over the counter to shoot a second time. Defendant drove away and the witnesses to his driving did not observe any driving problems. The officers who apprehended defendant shortly after the shooting detected no odor of alcohol or any other signs of intoxication. Upon arrest, defendant told an officer he was not drunk and did not like beer. None of the officers who observed defendant from the time he was arrested until his confession several hours later, detected any odor of alcohol about defendant or any other signs of intoxication. Moreover, his confession contained a detailed account of the murder, but no mention about ingesting alcohol or drugs.

Viewing the evidence in the light most favorable to defendant, even the testimony of defendant's witnesses did not meet the test for submission of an instruction on voluntary intoxication. Those witnesses testified defendant was drunk, but their testimony did not indicate that he was so completely intoxicated as to render him utterly incapable of forming a fixed purpose to kill. Medina testified only that defendant drank "beer" and was "drunk."

Defendant's cousin Ramirez testified defendant was drinking "beer" earlier in the day; and just before the police arrived, defendant

was nervous and shivering when he told Ramirez he "had shot some-body." Ramirez testified defendant was "very drunk" at this time, and had "a lot" of odor of alcohol about him, and his speech was "like when a person is drunk . . . the tongue is heavy." He noticed nothing else about defendant's condition.

And finally, defendant himself contradicted the testimony of his witnesses in testifying that it was tequila he was drinking and not beer. He testified that between noon and 8:15 p.m. he drank "a little over half" of a bottle of tequila. He testified he drove his car, but did not say he had any problems driving. He testified in minute detail about Medina asking defendant to drive Medina to the store, what Medina bought, the exact words Iqbal used in insulting Medina, and the actions defendant took in response to the insults.

Defendant testified, "I got very upset because of what he said about my father and also I was drugged that day;" adding that he had used cocaine before driving to the store. His testimony regarding his explanation for the shooting was merely, "I got very upset, and what happened, happened."

As to his condition, defendant testified merely, "I was drunk, I was drugged." Defendant never testified that he was so intoxicated that he could not premeditate or form a fixed purpose to kill (or in other words, that he could not think or plan). His testimony failed to indicate he was so completely intoxicated and without the ability to form intent. Rather, his testimony was that "I got very upset, and what happened, happened."

Evidence of this sort does not qualify defendant to receive a voluntary intoxication instruction. *See State v. Hunt*, 345 N.C. 720, 727-28, 483 S.E.2d 417, 422 (1997) (citation omitted) (evidence that defendant drank continuously on day of killing, shared three half-cases of beer and a fifth of Jim Beam, smoked marijuana, and was "pretty high," was insufficient to show that defendant was " 'utterly incapable of forming a deliberate and premeditated purpose to kill' "); *State v. Geddie*, 345 N.C. 73, 945, 478 S.E.2d 146, 157 (1996) (evidence that defendant drank two pints of white lightning over a period of time before the shooting, does not satisfy defendant's bur-den of production for an instruction on voluntary intoxication or second-degree murder); *State v. Herring*, 338 N.C. 271, 275-76, 449 S.E.2d 183, 186 (1994) (evidence that defendant consumed forty to sixty ounces of "liquid crack," four cans of malt liquor, and three marijuana joints, did not warrant instructions on voluntary intoxica-

tion and second-degree murder as evidence showed defendant had a detailed memory, had the presence of mind to flee, was in control of his actions, and had no odor of alcohol five hours later); *State v. Morston*, 336 N.C. 381, 404, 445 S.E.2d 1, 14 (1994) (evidence that various witnesses testified that defendant had consumed "a considerable amount" of gin less than one hour before the murder, had mixed crack cocaine and pain reliever with his gin, that his eyes were "big and red" and that he "looked like he was high," held insufficient to support submission of voluntary intoxication or second-degree murder instruction); *State v. Vaughn*, 324 N.C. 301, 308, 377 S.E.2d 738, 742 (1989) (voluntary intoxication instruction not warranted where defendant was intoxicated and smelled of alcohol and had trouble walking, but was responsive and aware of what was going on around him); *State v. Kornegay*, 149 N.C. App. 390, 395-96, 562 S.E.2d 541, 545 (2002) (instructions on voluntary intoxication and second-degree murder were not warranted where defendant was "drunk and high from smoking [cocaine]" and was "coming down," but where he took steps to avoid apprehension and remembered details surrounding the murder including the conversation he had with the victim prior to the murder).

Here, defendant's testimony was that he was intoxicated after ingesting an indeterminate amount of tequila and cocaine. However, he testified, in minute detail, his conversation with Iqbal, what he did, when he did it, and what he was thinking at all times, including the fact that he knew what was going on around him. Accordingly, defendant was not entitled to an instruction of voluntary intoxication.

In addition, defendant was not entitled to an instruction on second-degree murder. "The test in every case involving the propriety of an instruction on a lesser grade of an offense is not whether the jury could convict defendant of the lesser crime, but whether the State's evidence is positive as to each element of the crime charged and whether there is any conflicting evidence relating to any of these elements." *State v. Walls*, 342 N.C. 1, 47, 463 S.E.2d 738, 762 (1995).

First-degree murder is the unlawful killing of a human being committed with malice, premeditation, and deliberation. N.C.G.S. § 14-17 (2003). The unlawful killing of a human being with malice but without premeditation and deliberation is second-degree murder. *Id.* "If the evidence satisfies the State's burden of proving each element of first-degree murder, including premeditation and deliberation, and

there is no evidence to negate these elements other than defendant's denial, the trial court should exclude second-degree murder from the jury's consideration." *Geddie*, 345 N.C. at 94, 478 S.E.2d at 156.

A killing is premeditated if "the defendant formed the specific intent to kill the victim some period of time, however short, before the actual killing." *State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991). A killing is deliberate if the defendant acted "in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *Id.*

The fact that a defendant was angry or emotional will not negate the element of deliberation during a killing unless there was evidence the anger or emotion was strong enough to disturb defendant's ability to reason. *State v. Fisher*, 318 N.C. 512, 517, 350 S.E.2d 334, 338 (1986). "Evidence that the defendant and the victim argued, without more, is insufficient to show that the defendant's anger was strong enough to disturb his ability to reason." *State v. Solomon*, 340 N.C. 212, 222, 456 S.E.2d 778, 785 (1995). "[A] person may be excited, intoxicated and emotionally upset, and still have the capability to formulate the necessary plan, design, or intention to commit murder in the first[-]degree." *Vaughn*, 324 N.C. at 308, 377 S.E.2d at 742. "[N]o inference of the absence of deliberation and premeditation arises from intoxication, as a matter of law." *Mash*, 323 N.C. at 347, 372 S.E.2d at 537.

Here, the State's evidence of premeditation and deliberation was very strong. The videotape showed defendant walking to Iqbal and shooting, with no unsteadiness or loss of balance, even when leaning over the counter to shoot a second time. Defendant drove away and the witnesses to his driving did not observe any driving problems. The officers who apprehended defendant shortly after the shooting detected no odor of alcohol or any other signs of intoxication. Upon arrest, defendant told an officer he was not drunk and did not like beer. None of the officers who observed defendant from the time he was arrested until his confession several hours later, detected any odor of alcohol about defendant or any other signs of intoxication. Moreover, his confession contained a detailed account of the murder, but no mention about ingesting alcohol or drugs.

The only evidence defendant presented to the contrary was that he was intoxicated, and that he was very upset and angry. As to intox-

ication, defendant's case in the light most favorable to him showed only that he was merely intoxicated—he never presented any evidence that his intoxication affected his ability to think nor did he present evidence that he was so completely intoxicated that he was incapable of forming a deliberate and premeditated purpose to kill. We now hold, as did the Court in *State v. Strickland*, 321 N.C. 31, 42, 361 S.E.2d 882, 888 (1987), "[s]ince the State's evidence clearly showed every element of first[-]degree murder, and since defendant has not shown voluntary intoxication sufficient to negate specific intent, it follows that the trial court was not required to submit the possible verdict of second[-]degree murder to the jury."

This assignment of error is overruled.

## II

**[2]** Defendant next argues that "the trial court erred by constantly questioning and interrupting witnesses, aiding the prosecution in making its case, and giving the jury the impression that the trial court and the prosecution were working together." Specifically, defendant argues the trial court's questions had the prejudicial effect of expressing an opinion on the case, unfairly impacting the jury's decision.

A trial court has the duty to supervise and control trial proceedings to ensure fair and impartial justice for both parties, and in carrying out this duty, the court may question a witness in order to clarify confusing or contradictory testimony. *State v. Fleming*, 350 N.C. 109, 126, 512 S.E.2d 720, 732 (1999); *State v. Blackstock*, 314 N.C. 232, 333 S.E.2d 245 (1985). "In evaluating whether a [trial court's] comments cross into the realm of impermissible opinion, a totality of the circumstances test is utilized. Unless it is apparent that such infraction of the rules might reasonably have had a prejudicial effect on the result of the trial, the error will be considered harmless." *Fleming*, 350 N.C. at 130, 512 S.E.2d at 735. The burden of showing prejudice is on the defendant. *Blackstock*, 314 N.C. at 236, 333 S.E.2d at 248. The trial court's broad discretionary power to control the trial and to question witnesses to clarify testimony will not be disturbed absent a manifest abuse of discretion. *State v. Mack*, 161 N.C. App. 595, 598, 602, 589 S.E.2d 168, 171, 173 (2003), *disc. rev. denied*, 358 N.C. 379, 598 S.E.2d 140, *cert. denied*, —— U.S. ——, 160 L. Ed. 2d 336 (2004).

"The court may interrogate witnesses, whether called by itself or by a party." N.C.G.S. § 8C-1, Rule 614(b) (2003). The court properly uses this authority when it questions witnesses in order to clarify wit-

nesses' testimony, to enable the court to rule on the admissibility of certain evidence and exhibits, and to promote a better understanding of the testimony. *State v. Quick*, 329 N.C. 1, 25, 405 S.E.2d 179, 193 (1991); *see generally State v. Chandler*, 100 N.C. App. 706, 398 S.E.2d 337 (1990). Where the court does not express an opinion as to the facts, it is not error for a court to question a witness when necessary to clarify even a critical element of the case. *State v. Shepherd*, 163 N.C. App. 646, 652-53, 594 S.E.2d 439, 444 (2004). The trial court has a duty to control the examination of witnesses, both for the purpose of conserving the trial court's time and for the purpose of protecting witnesses from prolonged or needless or abusive examination, *State v. White*, 340 N.C. 264, 299, 457 S.E.2d 841, 861 (1995), or "to elicit overlooked pertinent facts," *Fleming*, 350 N.C. at 130, 512 S.E.2d at 732. "When the trial [court] questions a witness to clarify his testimony or to promote an understanding of the case, such questioning does not amount to an expression of the trial [court's] opinion as to defendant's guilt or innocence." *State v. Davis*, 294 N.C. 397, 402, 241 S.E.2d 656, 659 (1978).

Here, the trial court's questioning of witnesses fell into three categories: (I) questioning unfocused witnesses or clarifying ambiguous testimony or questions; (II) clarifying technical, or non-material, or non-disputed matters in an effort to save time and promote clarity; and (III) seeking clarity where the court did not hear, or was not clear as to testimony that had already been established. *See e.g., Quick*, 329 N.C. at 25, 405 S.E.2d at 193 (stating a court properly uses its authority when it questions witnesses in order to clarify ambiguous testimony and to enable the court to rule on the admissibility of certain evidence and exhibits); *State v. Yellorday*, 297 N.C. 574, 581, 256 S.E.2d 205, 210 (1979) ("From the record in this case it is crystal clear that the questions which [the trial court] asked [the witness] were solely for the purpose of clarifying his confused and sometimes conflicting testimony. . . . We are satisfied beyond peradventure that no one could reasonably infer from the exchanges between the [trial court] and [the witness] that the [trial court] was expressing an opinion as to what facts had been proven."); *Shepherd*, 163 N.C. App. at 652-53, 594 S.E.2d at 444 ("Having reviewed the trial court's examination of [the witness], we conclude that the trial [court] questioned the witness to clarify a critical element of the case, and the jury could not reasonably infer that the [trial court] was expressing an opinion as to the facts of the case."); *State v. Smarr*, 146 N.C. App. 44, 50, 551 S.E.2d 881, 885 (2001) (stating the trial court did not err in questioning witnesses where the questions were designed to clarify the

STATE v. RIOS

[169 N.C. App. 270 (2005)]

sequence of events and the trial court did not state an opinion as to the facts or the witnesses' credibility); *see also* N.C.G.S. § 8C-1, Rule 614(b) (2003) ("The court may interrogate witnesses, whether called by itself or by a party.").

Overarching all the difficulties in the circumstances of this particular case was the fact that it was a bilingual trial, with interpreters conducting translations in real-time. Here, the court fulfilled its duty to make the proceedings as clear and easy to understand as possible for the interpreters, witnesses, defendant, and the jury. In questioning witnesses in this case, the trial court was apparently seeking clarity and fairness, and did not express opinion.

When viewed in the totality of the circumstances, *Fleming*, 350 N.C. at 126, 512 S.E.2d at 732, the court here did not abuse its discretion, *Mack*, 161 N.C. App. at 598, 602, 589 S.E.2d at 171, 173, or convey the impression that the court and the prosecution were working together. Moreover, defendant has failed to present evidence that the trial court aided the prosecution in making its case, or gave the jury the impression that the trial court and the prosecution were working together. This assignment of error is overruled.

III

**[3]** Defendant next argues that the trial court committed plain error in giving a jury instruction on flight.

Plain error in an instruction is error "so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached." *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983). Here, there was no plain error committed, given the evidence that defendant left the scene and took steps to avoid apprehension. Specifically, the evidence showed defendant left the scene of the shooting and drove down two streets, at night, with the lights of the car turned off.

"[A] trial court may not instruct a jury on defendant's flight unless 'there is some evidence in the record reasonably supporting the theory that defendant fled after commission of the crime charged.' " *State v. Levan*, 326 N.C. 155, 164-65, 388 S.E.2d 429, 433-34 (1990) (quoting *State v. Irick*, 291 N.C. 480, 494, 231 S.E.2d 833, 842 (1977)). "The relevant inquiry [is] whether there is evidence that defendant left the scene of the murder and took steps to avoid apprehension." *Levan*, 326 N.C. at 165, 388 S.E.2d at 434. If "there was evidence tend-

ing to show that defendant, after shooting the victim, ran from the scene of the crime, got in a car waiting nearby, and drove away[, this] is sufficient evidence of flight to warrant the instruction." *State v. Reeves*, 343 N.C. 111, 113, 468 S.E.2d 53, 55 (1996).

The evidence in this case consists of testimony from Frances Hines that after she heard two shots, two people came out of the store, one ran around the building on foot and the other got in a car. The driver then drove down Foust Street and Green Street with the lights turned off, despite the fact that it was dark outside. Hal Hines also testified that after he heard the shots he observed a car moving down the street with its lights turned off. It was a dark-colored car, and it was "pitch dark" outside. This constitutes "some evidence" that defendant left the scene of the crime and took steps to avoid apprehension.

Also, failure to render assistance to the victim is a factor to be considered in giving the flight instruction. *See State v. Anthony*, 354 N.C. 372, 425, 555 S.E.2d 557, 591 (2001) (flight instruction properly given where after shooting, defendant "immediately entered his car and quickly drove away from the crime scene without rendering any assistance to the victims or seeking to obtain medical aid for them"); *State v. Lloyd*, 354 N.C. 76, 119, 552 S.E.2d 596, 626 (2001) (trial court did not err in instructing jury on flight where defendant left crime scene hurriedly in his car without providing medical assistance to the victim).

Defendant argues the facts of this case are similar to those of *State v. Holland*, 161 N.C. App. 326, 588 S.E.2d 32 (2003), yet *Holland* is distinguishable as the defendant in *Holland* did not drive away from the crime scene, at night, with the car lights turned off. Further, the Court in *Holland* concluded that giving the flight instruction was harmless, "in light of the remaining evidence, including the identification of defendant as the perpetrator of the crimes charged." *Holland*, 161 N.C. App. at 330, 588 S.E.2d at 36.

This assignment of error is overruled.

IV

[4] Defendant finally argues the trial court erred in denying his motion to dismiss the indictment because use of a short-form murder indictment violated his constitutional rights in that the indictment failed to list all the necessary elements of first-degree murder. This

assignment of error is summarily overruled. *See State v. Anderson,* 355 N.C. 136, 558 S.E.2d 87 (2002); *State v. Long,* 354 N.C. 534, 557 S.E.2d 89 (2001); *State v. King,* 353 N.C. 457, 546 S.E.2d 575 (2001); *State v. Call,* 353 N.C. 400, 545 S.E.2d 190 (2001), *cert. denied,* 357 N.C. 579, 589 S.E.2d 130 (2003); *State v. Braxton,* 352 N.C. 158, 531 S.E.2d 428 (2000).

No error.

Judges HUNTER and JACKSON concur.