STATE OF NORTH CAROLINA
v.
DRAKE ALLEN REARDON.
No. COA08-780
Court of Appeals of North Carolina.
Filed April 7, 2009
This case not for publication
Attorney General Roy A. Cooper, III, by Special Deputy Attorney General Francis W. Crawley, for the State.
Robert W. Ewing for defendant-appellant.
ROBERT C. HUNTER, Judge.
Drake Allen Reardon ("defendant") was indicted for first degree murder of Kassandra Harner and for possession of a firearm by a felon in connection with a shooting that occurred on 2 May 2005. On 21 February 2008, a jury found defendant guilty of the lesser-included offense, second degree murder, and of possession of a firearm by a felon. Defendant's two convictions were consolidated for judgment. On 22 February 2008, the trial court entered a judgment sentencing defendant to a term of 204 to 297 months imprisonment, which was in the presumptive range for defendant's Class B2 felony and prior record level of IV. From this judgment, defendant appeals. Evidence at trial establishes the following factual background. Defendant and Ms. Harner had a baby together and were living in a house located at 619 South Morgan Street in Shelby, North Carolina. Daisy Barino lived in the house next door, 621 South Morgan Street.
Around 11:30 p.m. on 1 May 2005, Officer Danny Halloran of the Shelby police was dispatched to the area after receiving a call about a black male with a gun. Upon arriving, Officer Halloran noticed a black male walking out of 619 South Morgan Street, whom Officer Halloran recognized to be Terrance Parker ("Bookie"). He spoke with Ms. Harner, who told Officer Halloran that it was her house. Ms. Harner gave Officer Halloran consent to search the house for a gun. Officer Halloran began searching the area around the doorway, but stopped as he approached a clothing basket of lingerie, which Ms. Harner said contained her belongings. Officer Halloran then saw Ms. Harner go onto the porch at 621 South Morgan and speak to defendant.
Officer Halloran was later dispatched to 621 South Morgan Street around 3:30 a.m. on 2 May 2005. He arrived and saw the victim, who had a bullet wound to her head, lying on the porch. He also saw Ms. Barino. Officer Halloran called for medical assistance, and then began looking for a suspect, but did not find one. Officer Shannon Price was also dispatched to the scene of the shooting and arrived around 3:34 a.m. He testified that a black female said "'Drake did it, Drake did it'" and pointed south. Officer Halloran spoke to Ms. Barino later on the morning of 2 May 2005, and Ms. Barino told him that Ms. Harner hid the gun he had been looking for earlier in a clothing basket, wrapped up in underwear. Ms. Barino also told the officer that Ms. Harner and defendant had domestic problems, but seemed to be working them out. Detective David Gemes interviewed Ms. Barino that morning at the police station. Ms. Barino told him that defendant shot Ms. Harner.
Officer Mark Lesassier was dispatched to the Worthy Plumbing Company around 6:00 a.m. as the result of a radio transmission of a reported break-in. Worthy Plumbing is approximately one-quarter mile from the location of the shooting. When Officer Lesassier arrived, he noticed defendant "juggling" the door. Officer Lesassier then handcuffed defendant, began searching him, and seized a .22 caliber revolver. Detective David Gemes interviewed defendant later that morning and defendant claimed that the shooting was an accident.
Dr. Michael Sullivan performed an autopsy on Ms. Harner on 3 May 2005 and concluded that Ms. Harner's cause of death was a gunshot wound to the head. Dr. Sullivan also testified that the powder burns around the entrance wound indicated that the barrel of the gun was extremely close to the victim's skin when it was discharged.
Agent Shane Green examined the gun taken from defendant and the bullet removed from Ms. Harner. He testified that the gun had an internal safety mechanism, which is designed to prevent accidental firing, and that the safety was in proper working order. He also testified that the bullet found in the victim could have come from the gun found on defendant, but he could not conclusively determine that was the case. He was also of the opinion that the barrel of the weapon was just a few inches from the victim when fired.
After the State rested, defendant called Ms. Barino. Ms. Barino testified that defendant and Ms. Harner were drinking on the evening of 1 May 2005 and that Bookie had been at their house. The couple came over to Ms. Barino's house because their house did not have electricity. Ms. Barino noticed a white- or pearl-handled object in defendant's back pocket, but was not sure whether it was a gun. Later in the evening, defendant left, and Ms. Harner followed. Ms. Barino was looking after the baby because defendant and Ms. Harner were intoxicated. The two came back and were on the front porch for approximately thirty to forty-five minutes before Ms. Barino heard a gunshot. Ms. Barino stuck her head out the door, and asked defendant if he shot Ms. Harner. Ms. Barino thought he said "[t]ell Cassie I'm sorry Daisy." However, at trial Ms. Barino recalled that she misunderstood defendant. She testified that defendant actually said, "I didn't shoot Cassie, Daisy." Ms. Barino told defendant to call 911, but a neighbor refused to let him use the telephone. Ms. Barino also told defendant she would not come outside until he got rid of the gun. Ms. Barino eventually left to call for medical assistance and told the 911 operator that "Dra had shot Cassie."

I.
Defendant first assigns error to the trial court's admission of Officer Lesassier's testimony regarding a statement made by the owner of Worthy Plumbing on the ground that it is inadmissible hearsay. The testimony in question is as follows:
Q. When you arrived at Worthy Plumbing on  in the early morning hours of May 2nd, did you see anyone there?
A. There was a white male standing in front of the main door to the business.
Q. What, if anything did you notice on or about this white male?
A. He was standing, like juggling the door, and the owner of Worthy Plumbing gave us a call saying somebody was trying to break in.
MR. HALL: Objection.
THE COURT: Overruled.
A. Said somebody was breaking into the business.
(Emphasis added.)
Rule 801(c) of the North Carolina Rules of Evidence define "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c) (2007). "When evidence of such statements by one other than the witness testifying is offered for a proper purpose other than to prove the truth of the matter asserted, it is not hearsay and is admissible." State v. Coffey, 326 N.C. 268, 282, 389 S.E.2d 48, 56 (1990). Specifically, "[s]tatements of one person to another are not hearsay if the statement is made to explain the subsequent conduct of the person to whom the statement was made." State v. Reid, 335 N.C. 647, 661, 440 S.E.2d 776, 784 (1994).
Here, the statement in question was not offered for the truth of the matter asserted. Instead, it was offered to explain Officer Lesassier's subsequent conduct in responding to Worthy Plumbing. We have previously held that statements made to explain an officer's initiation of an investigation are admissible as non-hearsay. See State v. Patterson, 185 N.C. App. 67, 70, 648 S.E.2d 250, 252 (2007) (statement made to an officer explained the chain of events in the police investigation, and therefore was non-hearsay), disc. review denied, 362 N.C. 242, 660 S.E.2d 538 (2008); State v. Blair, 181 N.C. App. 236, 246, 638 S.E.2d 914, 921 (holding that officer's testimony that the police department had received complaints about prostitution, street-level drugs, and other crimes was admissible to explain why he was conducting surveillance and thus in a position to observe the robbery in question), appeal dismissed and disc. review denied, 361 N.C. 570, 650 S.E.2d 815 (2007). We therefore hold that Officer Lesassier's testimony was not hearsay. Accordingly, the trial court did not err in overruling defendant's objection. This assignment of error is overruled.

II.
Defendant next argues that the trial court erred by instructing the jury on "flight" over defendant's objection. In accordance with the North Carolina Pattern Instructions, the trial court instructed the jury on flight as follows: The State in this case contends, and the Defendant denies, that the Defendant fled. Evidence of flight may be considered by you together with all other facts and circumstances in this case in determining whether the combined circumstances amount to an admission or show a consciousness of guilt. However, proof of this circumstance is not sufficient in itself to establish the Defendant's guilt. Further this circumstance has no bearing on the question of whether the Defendant acted with premeditation and deliberation. Therefore, it must not be considered by you as evidence of premeditation or deliberation.
It is well-established that "[e]vidence of a defendant's flight following the commission of a crime may properly be considered by a jury as evidence of guilt or consciousness of guilt." State v. King, 343 N.C. 29, 38, 468 S.E.2d 232, 238 (1996) (citing State v. Lampkins, 283 N.C. 520, 196 S.E.2d 697 (1973)). A trial court may instruct a jury on defendant's flight if "there is some evidence in the record reasonably supporting the theory that defendant fled after commission of the crime charged[.]" State v. Irick, 291 N.C. 480, 494, 231 S.E.2d 833, 842 (1977). However, "[m]ere evidence that defendant left the scene of the crime is not enough to support an instruction on flight. There must also be some evidence that defendant took steps to avoid apprehension." State v. Thompson, 328 N.C. 477, 490, 402 S.E.2d 386, 392 (1991) (citation omitted).
We must view the evidence of flight in the light most favorable to the State. See State v. Anthony, 354 N.C. 372, 425, 555 S.E.2d 557, 591 (2001), cert. denied, 536 U.S. 930, 153 L. Ed. 2d 791 (2002). The evidence presented in this case, when considered in a light most favorable to the State, was sufficient to warrant the trial court's instruction on flight. Ms. Barino indicated that she would not come outside while defendant had a gun and instructed him to dispose of it. Defendant then left the scene of the shooting. He was last seen headed south and an unnamed black female told officers that "Drake did it." During the time that defendant was away, law enforcement began searching for him. Over two hours later, after the police had arrived at the scene of the shooting, Officer Lesassier found him "juggling" the door at Worthy Plumbing, which was only a quarter mile away from the incident.
Although defendant explained that he was simply following Ms. Barino's instruction after being turned away by a neighbor, the evidence shows that he did nothing further to assist the victim or aid law enforcement. He did not go back to his own house, which was next door, or otherwise remain nearby to assist the victim and wait for law enforcement and emergency personnel to arrive. See, e.g., State v. Rios, 169 N.C. App. 270, 284, 610 S.E.2d 764, 774 ("failure to render assistance to the victim is a factor to be considered in giving the flight instruction"), appeal dismissed and disc. review denied, 360 N.C. 75, 623 S.E.2d 37 (2005); State v. Eubanks, 151 N.C. App. 499, 503, 565 S.E.2d 738, 741 (2002) (finding an instruction on flight appropriate where defendant provided no assistance to the victim he shot, fled the scene, and failed to contact the police). Moreover, "[t]he fact that there may be other reasonable explanations for defendant's conduct does not render the instruction improper." Irick, 291 N.C. at 494, 231 S.E.2d at 842. Based on the foregoing, the jury could infer that defendant did not simply walk away from the shooting, but attempted to avoid apprehension after leaving. Accordingly, we conclude that the trial court's instruction on flight was supported by the evidence. This assignment of error is overruled.
No error.
Judges McGEE and JACKSON concur.
Report per Rule 30(e).